# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

GERALD LEE FARRELL,    )
                                          )
                Plaintiff,              )
                                          )
        v.                                 )        Civil Action No. 17-490 (RBW)
                                          )
REX W. TILLERSON, in his official    )
capacity as Secretary of State of the  )
United States, <u>et al.</u>,              )
                                          )
                Defendants.          )
_____)

## <u>MEMORANDUM OPINION</u>

The <u>pro se</u> plaintiff, Gerald Lee Farrell, brings this civil action against the defendants,

Rex W. Tillerson, the Secretary of the United States Department of State (the "Secretary") and

Corrin Ferber, Director of the Office of Legal Affairs, Bureau of Consular Affairs of the United

States Department of State ("the Department"), alleging that the defendants' denial of his request

for a Certificate of Loss of Nationality violated the Immigration and Nationality Act ("INA"), 8

U.S.C. §§ 1101–1537 (2012), 18 U.S.C. § 1429 (2012), and the Administrative Procedure Act

("APA"), 5 U.S.C. §§ 701–706 (2012).  <u>See generally</u> Amended Complaint ("Am. Compl.").

Currently before the Court is the Defendants' Motion to Dismiss ("Defs.' Mot."), which seeks

dismissal of the plaintiff's amended complaint pursuant to Federal Rule of Civil Procedure

12(b)(6); the Defendants' Motion for Relief from Local Civil Rule 7(n) ("Defs.' Rule 7(n)

Mot."); and the plaintiff's Motion for Summary Judgment ("Pl.'s Mot.").  Upon consideration of

the parties' submissions,[1] the Court concludes that it must deny the defendants' motion to

---

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss ("Defs.'

(continued . . . )

dismiss, deny as moot the defendants' motion for relief from Local Civil Rule 7(n), and order the

defendant to respond to the plaintiff's motion for summary judgment.

## I.    BACKGROUND

### A.    Statutory and Regulatory Framework

Section 349 of the INA provides that "a national of the United States whether by birth or

naturalization, shall lose his nationality by voluntarily performing any [one] of [seven] acts with

the intention of relinquishing United States nationality."  8 U.S.C. § 1481(a).  These acts are

codified as subsections (a)(1) through (a)(7) of 8 U.S.C. § 1481.  With regards to subsections

(a)(1) through (a)(5), the statute provides that "no national of the United States can lose United

States nationality . . . while within the United States . . . ."  Id. § 1483(a).  At issue in this case is

subsection (a)(1), which provides that an individual "shall lose his nationality by voluntarily . . .

[, and] with the intention of relinquishing United States nationality[,] . . . obtaining naturalization

in a foreign state upon his own application or upon an application filed by a duly authorized

agent, after having attained the age of eighteen years."  8 U.S.C. § 1481(a)(1).[2]  Under the INA,

> [w]henever a diplomatic or consular officer of the United States has reason to
> believe that a person while in a foreign state has lost his United States nationality
> under [8 U.S.C. § 1481] . . . , he shall certify the facts upon which such belief is
> based to the Department . . . , in writing, under regulations prescribed by the
> Secretary[.]  If the report of the diplomatic or consular officer is approved by the
> Secretary . . . , the diplomatic or consular office in which the report was made shall
> be directed to forward a copy of the certificate to the person to whom it relates.
> Approval  by  the  Secretary . . . of  a  certificate . . . shall  constitute  a  final
> administrative determination of loss of United States nationality[.]

8 U.S.C. § 1501.  The certificate to which the statute refers is known as a "Certificate of Loss of

---

( . . . continued)
Mem."); (2) the Plaintiff'[s] Response Opposing Defendant[s'] Motion to Dismiss ("Pl.'s Opp'n"); and (3) the
Defendants' Reply to Plaintiff's Response Opposing Defendants' Motion to Dismiss ("Defs.' Reply").

[2] Under the INA, "naturalization" is defined as "the conferring of nationality of a state upon a person after birth, by
any means whatsoever."  8 U.S.C. § 1101(a)(23).

Nationality." See, e.g., 7 Foreign Affairs Manual 1227(a) (instructing consular officers to prepare a "Certificate of Loss of Nationality" when they "have reason to believe that [an] individual has committed an expatriating act voluntarily and with the intention of relinquishing U.S. nationality"); see also Weber v. U.S. Dep't of State, 885 F. Supp. 2d 46, 50 (D.D.C. 2012) (referring to the "certificate" described in § 1501 as a Certificate of Loss of Nationality).

The Secretary is responsible for administering and enforcing loss of nationality under subsections (a)(1) through (a)(5). See Defs.' Mem. at 4; see also 8 U.S.C. § 1104(a) ("The Secretary . . . [is] charged with the administration and the enforcement of . . . the powers, duties, and functions of diplomatic and consular officers of the United States, . . . and [ ] the determination of nationality of a person not in the United States."). In connection with these duties, the Secretary has promulgated various regulations, including 22 C.F.R. § 50.40, which provides that the Secretary will "presume[]" that a citizen who obtains naturalization in a foreign state pursuant to subsection (a)(1) "inten[ds] to retain [United States] citizenship"; however, if that citizen "affirmatively asserts to a consular officer, after he or she has committed [the] potentially expatriating act, that it was his . . . intent to relinquish [United States] citizenship," then the presumption is rebutted and the citizen "will lose his . . . citizenship." 22 C.F.R. § 50.40(a) (2017).

The Secretary has also provided specific guidance to consular officers regarding the administration of loss of nationality claims in his Foreign Affairs Manual (the "Manual" or "FAM"). Relevant to subsection (a)(1), the Manual provides that if consular officers considering a claim brought under subsection (a)(1) "become aware [that] a citizen acquired foreign nationality [a]nd[] the citizen asserts or advises [them] . . . that [his] intent was to relinquish [United States] citizenship," then "[t]he administrative presumption of intention to retain [United

States] nationality is inapplicable[ a]nd[] it is necessary to develop the case and assess [the]

voluntariness and intent." 7 FAM 1221, Exhibit ("Ex.") 1 (Loss-of-Nationality Flow Chart

("Flow Chart")). In this situation, the Manual instructs a consular officer to send a letter to the

citizen that "[p]rovide[s] [him with a copy of] . . . Form DS-4079, Questionnaire: Information for

Determining Possible Loss of [United States] Citizenship," id., and requests that he "fill out . . .

and [ ] submit [the] form," 7 FAM 1224.3(2). The Manual also instructs a consular officer to

"arrange to interview the citizen," 7 FAM 1221, Ex. 1 (Flow Chart), explaining that "it may be

necessary to contact the [citizen] to discuss next steps and clarify any issues that arise in

reviewing the responses to Form DS-4079," but that "[c]onsular officers can be flexible in

determining whether this should include an in person, telephone, or e-mail contact," 7 FAM

1224.5. Finally, to prepare a Certificate of Loss of Nationality, the Manual instructs consular

officers to assemble and submit a package containing, inter alia, Form DS-4079 and Form

DS-4081, which is a "Statement of Understanding Concerning the Consequences and

Ramifications of Relinquishment or Renunciation of [United States] Citizenship." 7 FAM

1227(a)(3)–(4). Both Forms DS-4079 and DS-4081 instruct citizens to sign the forms in the

presence of a consular officer. See Form DS-4079: Request for Determination of Possible Loss

of United States Citizenship, https://eforms.state.gov/Forms/ds4079.pdf (last visited Apr. 12,

2018) (instructing applicants to sign the form "before a [c]onsular [o]fficer at a [United States]

Embassy or Consulate"); see also Form DS-4081: Statement of Understanding Concerning the

Consequences and Ramifications of Renunciation or Relinquishment of U.S. Nationality,

https://eforms.state.gov/Forms/ds4081.pdf (last visited Apr. 12, 2018) (requiring a "consular

officer's attestation" that the citizen "appeared personally . . . and signed th[e] statement . . .

before [the officer]").[3]

## B.    Factual and Procedural History

The plaintiff is a United States citizen by birth.  See Am. Compl., Ex. 1 (Certificate of Live Birth); see also Defs.' Mem. at 8.  However, he alleges that he "moved to Switzerland in . . . []1994[]," "married a Swiss citizen in 1996," and "obtain[ed] naturalization in Switzerland" in 2004.  Am. Compl. at 5.  In 2014, the plaintiff pleaded guilty in the United States to federal criminal charges and was sentenced to a ninety-six-month prison term.  See Judgment at 1–2, United States v. Farrell, Crim. Action No. 4-180-BLW (D. Idaho June 25, 2014), ECF No. 48.[4]  The plaintiff is currently incarcerated at the Federal Correctional Institution in Big Spring, Texas.  See Am. Compl. ¶ 14; see also Defs.' Mem. at 8.[5]

On May 31, 2016, the plaintiff sent a letter to then-United States Ambassador to Switzerland Susan LeVine, requesting that she issue him a Certificate of Loss of Nationality pursuant to § 1481(a)(1).  See Am. Compl., Ex. 6 (Letter from Gerald Lee Farrell to the Honorable Susan LeVine, United States Ambassador to Switzerland (May 31, 2016) ("May 31, 2016 Letter")) at 1.[6]  In the letter, he represented that he "became [a] Swiss [citizen] in 2004,"

___

[3] The Court takes judicial notice of Form DS-4079 and Form DS-4081 because they are both available on the Department's public website.  See United States ex rel. Groat v. Boston Heart Diagnostics Corp., 255 F. Supp. 3d 13, 24 n.7 (D.D.C. 2017) (Walton, J.) ("[C]ourts in this jurisdiction have frequently taken judicial notice of information posted on official public websites of government agencies." (quoting Pharm. Research & Mfrs. of Am. v. U.S. Dep't of Health & Human Servs., 43 F. Supp. 3d 28, 33 (D.D.C. 2014))).

[4] The Court also takes judicial notice of the judgment entered by the court in the plaintiff's federal criminal case.  See HTC Corp. v. IPCom GmbH & Co., KG, 671 F. Supp. 2d 146, 151 n.3 (D.D.C. 2009) ("A court may take judicial notice of court documents and other public records." (citing Covad Comms. Co. v. Bell Atl. Corp., 407 F.3d 1220, 1222 (D.C. Cir. 2005)).

[5] A search for the plaintiff's first and last name using the inmate locator on the Federal Bureau of Prisons website confirms that the plaintiff is currently incarcerated at the Big Spring Federal Correctional Institution.  See Find an Inmate, Fed. Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited Apr. 12, 2018).

[6] The plaintiff also invoked subsections (a)(2) and (a)(5) in his May 31, 2016 letter to former Ambassador LeVine, see Am. Compl., Ex. 6 (May 31, 2016 Letter) at 1, 5; however, none of the subsequent communications with the Department raise claims under these subsections, see generally Am. Compl., Exs. 6, 8, 10, 14, 16.  And, the plaintiff

(continued . . . )

having been issued a Swiss passport in that year, and that he did so "voluntarily and with the

intent to irrevocably lose [his] United States citizenship." Id., Ex. 6 (May 31, 2016 Letter) at 1.

In support of his position, he attached several documents, including an affidavit in which he

stated that he had "applied for citizenship in . . . Switzerland, while on Swiss soil with the intent

of losing [his] citizenship of the United States of America," id., Ex. 6 (May 31, 2016 Letter) at 4;

as well as what purports to be a Form DS-4081, notarized by a Texas-commissioned notary

public, see id., Ex. 6 (May 31, 2016 Letter) at 3.

On June 22, 2016, an unnamed representative of the United States Embassy in

Switzerland (the "Embassy") responded by letter to the individual designated by the plaintiff as

having power of attorney to act on his behalf. See id., Ex. 7 (Letter from American Citizen

Services Section, United States Embassy, Bern, Switzerland, to Rene Schreiber (June 22, 2016)

("June 22, 2016 Letter")) at 1. In the response, the representative explained that because a

"[United States] passport was issued to [the plaintiff] in 2013[, after he] acquired Swiss

nationality in 2004, . . . expatriation d[id] not apply in his case." Id., Ex. 7 (June 22, 2016 Letter)

at 1. But, the representative advised that if the plaintiff "should now choose to renounce his

[United States] nationality," he could do so by "renounc[ing] [ ] in the presence of a consular

officer; [ ] outside [of] the United States; and [ ] in the precise form prescribed by the Secretary

of State." Id., Ex. 7 (June 22, 2016 Letter) at 1.

On July 21, 2016, the plaintiff's counsel sent a letter to the Ambassador asserting that

"[t]he current denial to issue [the plaintiff] a Certificate of Loss of Nationality was solely based

---

( . . . continued)
does not base his claims in this Court on these subsections. See, e.g., Am. Compl. ¶ 9 (asserting that he "seeks a
judicial determination of his loss of [United States] [n]ationality on the basis of his performance of [subsection]
(a)(1)").

on a misunderstanding of the origin of the alleged 2013 [United States p]assport, which was actually solely requested and obtained by the [United States] Government," id., Ex. 8 (Letter from Craig Harris Collins to the Honorable Susan LeVine, United States Ambassador to Switzerland (July 21, 2016) ("July 21, 2016 Letter")) at 2, "presumably . . . for [the plaintiff's] extradition . . . to the United States," id., Ex. 8 (July 21, 2016 Letter) at 3. The plaintiff's counsel represented that "[i]n 2004, [the plaintiff] voluntarily became a citizen of Switzerland . . . pursuant [to] 8 U.S.C. § 1481(a)(1)," and argued that "[t]he loss of [the plaintiff's] United States nationality was effective immediately, not when it is administratively or judicially determined." Id., Ex. 8 (July 21, 2016 Letter) at 1.

On August 9, 2016, the Vice Consul for the Embassy responded to the plaintiff's counsel's letter, explaining that "to pursue expatriation . . . , [the plaintiff] would have to come to the Embassy in [Switzerland] to sign form DS-4081 . . . in person in front of a consular officer," as well as "complete . . . the enclosed form DS-4079 . . . and send [it] to [the Embassy]." Id., Ex. 9 (Letter from Matthew Boullioun, Vice Consul, United States Embassy, Bern, Switzerland, to Craig Harris Collins (Aug. 9, 2016)). The plaintiff's counsel responded, reiterating his "legal position for [the plaintiff]'s 2004 expatriation" and incorporating from his July 21, 2016 letter "all [of] the relevant statutes, . . . [r]egulations and controlling case law [ ] substantiat[ing] this position." Id., Ex. 10 (Letter from Craig Harris Collins to Matthew Boullioun, Vice Consul, United States Embassy, Bern, Switzerland (Aug. 19, 2016)) at 2. The Vice Consul again responded and asserted that "[United States] citizens cannot lose [United States] nationality while within the United States on the basis of . . . (a)(1)." Id., Ex. 11 (Letter from Matthew Boullioun, Vice Consul, United States Embassy, Bern, Switzerland, to Craig Harris Collins (Sept. 14, 2016)) at 1 (citing 8 U.S.C. § 1483(a)). The plaintiff's counsel then sent a final letter

to the Vice Consul on September 14, 2016, restating his position and requesting that the Vice

Consul "consult internally with a legal officer before making a final denial [of the plaintiff]'s . . .

request." See id., Ex. 12 (Letter from Craig Harris Collins to Matthew Boullioun, Vice Consul,

United States Embassy, Bern, Switzerland (Sept. 14, 2016)).

On September 19, 2016, the plaintiff's counsel sent a letter to the Director of the Bureau

of Consular Affairs of the Department, informing the Director that the plaintiff "ha[d] been

informally denied by [the] Consulate in [Switzerland] the issuance of a Certificate of Loss of

Nationality," id., Ex. 13 (Letter from Craig Harris Collins to Director, Office of Legal Affairs,

Bureau of Consular Affairs, United States Department of State (Sept. 19, 2016) ("Sept. 19, 2016

Letter") at 3, and requesting "a reevaluation by the Department of this informal decision," id.,

Ex. 13 (Sept. 19, 2016 Letter) at 6. In the letter, he argued that "there is no personal appearance

requirement" for an act committed under subsection (a)(1), "only a written affirmation"

requirement. Id., Ex. 13 (Sept. 19, 2016 Letter) at 3. In support of the plaintiff's counsel's

position, the letter purported to attach a notarized copy of the plaintiff's Swiss passport, see id.,

Ex. 13 (Sept. 19, 2016 Letter) at 1, as well as the plaintiff's affidavit "confirming his voluntary

commission in 2004 of [an expatriating act under subsection (a)(1)] on Swiss soil [and] his intent

to lose his [United States] nationality," see id., Ex. 13 (Sept. 19, 2016 Letter) at 2.

On November 9, 2016, defendant Ferber responded to the plaintiff's counsel by letter,

informing him that although the Department had "carefully reviewed [his] explanation of [the

plaintiff]'s circumstances, the history of [his] correspondence with the [Embassy] . . . , and [his]

legal arguments in support of [the plaintiff]'s request [for] a [Certificate of Loss of Nationality]

under section 349(a)(1)," it could not "approve a [Certificate of Loss of Nationality] for [the

plaintiff] based on 349(a)(1) at th[at] time." Id., Ex. 14 (Letter from Corrin M. Ferber, Director,

Overseas Citizens Services, Office of Legal Affairs, United States Department of State, to Craig

Harris Collins (Nov. 9, 2016) ("Nov. 9, 2016 Letter") at 1. The letter explained that

> [a]s a threshold matter, the Department cannot approve a [Certificate of
> Loss of Nationality] based on [§] 349(a)(1) while the [United States] national is
> residing in the United States. . . . There is no question that a [United States] citizen
> who seeks a [Certificate of Loss of Nationality] based on [§] 349(a)(1) remains so
> until the Department's approval of the [Certificate of Loss of Nationality], which,
> by statute, constitutes the final administrative determination of loss. Loss is not
> automatic upon the commission of the potentially expatriating act.

Id., Ex. 14 (Nov. 9, 2016 Letter) at 1. It further explained that the plaintiff

> did not comply with the applicable procedures to obtain a [Certificate of Loss of
> Nationality] . . . on the basis of [ ] section 349(a)(1) while abroad prior to his
> incarceration, including [his] signature on the required Department . . . forms
> before a consular officer, and [he] cannot do so now while he is within the United
> States.

Id., Ex. 14 (Nov. 9, 2016 Letter) at 2. Finally, defendant Ferber informed the plaintiff's counsel

that "[n]othing in [her] letter preclude[d] [the plaintiff] from properly submitting an application

for a [Certificate of Loss of Nationality] on the basis of [§] 349(a)(1) at some point in the future,

once he is outside of the United States." Id., Ex. 14 (Nov. 9, 2016 Letter) at 3.

On December 1, 2016, the plaintiff's counsel responded by letter to defendant Ferber's

letter. See id., Ex. 15 (Letter from Craig Harris Collins to Corrin M. Ferber, Director, Overseas

Citizens Services, Office of Legal Affairs, United States Department of State (Dec. 1, 2016)

("Dec. 1, 2016 Letter")) at 1. The plaintiff's counsel raised a number of legal arguments seeking

to refute defendant Ferber's "contention that [the Department] cannot issue [the plaintiff] a

[Certificate of Loss of Nationality] while he is on [United States] soil," reiterating his position

"that [the plaintiff] has already lawfully expatriated under 349(a)(1) . . . [and] is presently solely

a Swiss citizen . . . deportable [ ] under . . . the INA." Id., Ex. 15 (Dec. 1, 2016 Letter) at 2; see

also id., Ex. 15 (Dec. 1, 2016 Letter) at 3–11. The plaintiff's counsel "request[ed] that

[defendant Ferber] indicate in [his] response to th[e] letter that 'this is [the Department's] final

agency action' in this matter." Id., Ex. 15 (Dec. 1, 2016 Letter) at 12.

On February 8, 2017, defendant Ferber again responded to the plaintiff's counsel by letter, informing him that the Department had "reviewed [the plaintiff's] additional arguments," but that "the Department maintain[ed] that [it could ]not approve a [Certificate of Loss of Nationality for [the plaintiff] under section 349(a)(1) . . . at th[at] time." Id., Ex. 16 (Letter from Corrin M. Ferber, Director, Overseas Citizens Services, Office of Legal Affairs, United States Department of State (Feb. 8, 2017 Letter)) at 1.[7] Specifically, defendant Ferber

> reiterate[d] that [the plaintiff's] request for a [Certificate of Loss of Nationality] on
> the basis of [§] 349(a)(1) is unavailing[] because [the plaintiff] is within the United
> States and, thus, ineligible to expatriate under that section. In accordance with [the]
> INA . . . , the Department can only issue a [Certificate of Loss of Nationality] on
> the basis of an application properly completed abroad, in accordance with
> procedures set forth at 7 FAM 1200 . . . . The process for obtaining a [Certificate
> of Loss of Nationality] on the basis of [ ] section 349(a)(1) includes the individual
> signing the DS-4079 before a consular officer at post abroad, and completing an
> interview with a consular officer to determine whether the expatriating act was
> performed voluntarily and with the intent to relinquish [United States] citizenship.

Id., Ex. 16 (Feb. 8, 2017 Letter) at 1. The letter further explained that "[n]one of the cases on which [the plaintiff's counsel] rel[ied] would permit the Department's issuance of a [Certificate of Loss of Nationality] on the basis of [ ] section 349(a)(1) to a [United States] citizen requesting a [Certificate of Loss of Nationality] from within the United States." Id., Ex. 16 (Feb. 8, 2017 Letter) at 1. Finally, the letter "reiterate[d that] th[e] decision d[id] not preclude [the plaintiff] from properly submitting an application for a [Certificate of Loss of Nationality] on the basis of [ ] section 349(a)(1) once he is outside of the United States," and added that "[s]hould [the plaintiff] do so, the Department would evaluate the substantive aspects of his application at that time." Id., Ex. 16 (Feb. 8, 2017 Letter) at 1. In addition, the letter "refer[red the plaintiff] to the Department

---

[7] Exhibit 16 is an email from the plaintiff's counsel to the plaintiff, which purports to forward defendant Ferber's February 8, 2017 letter to the plaintiff's counsel. See Am. Compl., Ex. 16 (Feb. 8, 2017 Letter) at 1.

of Homeland Security for applicable procedures on applying for a [Certificate of Loss of Nationality] from within the United States on the basis of [subsection] (a)(6)." Id., Ex. 16 (Feb. 8, 2017 Letter) at 1.

Shortly thereafter, on March 15, 2017, the plaintiff filed this suit. See Complaint at 1. Despite having been represented by counsel in his communications with the defendants, the plaintiff has represented that he is now proceeding pro se in this case. See Plaintiff's Notice to the Court and Parties of Pro Se Appearance ("Pl.'s Notice") ¶ 2.[8]

## II.    STANDARD OF REVIEW

### A.    Motion to Dismiss

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Thus, to survive a motion to dismiss for "failure to state a claim upon which relief can be granted," Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (1955)); see also Fed. R. Civ. P. 12(b)(6). A claim presents facial plausibility where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. Accordingly, the "plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer

---

[8] The plaintiff filed this notice in response to the Court's order instructing him to "file[] a notice indicating whether he is proceeding pro se in this matter or whether he is represented by Craig Harris Collins, on or before September 15, 2017." Minute Order (Aug. 31, 2017). The defendants state in their reply that "it appears that . . . [the p]laintiff has complied with the Court's August 31, 2017[] [O]rder" and "also [ ] with [the signature requirement of] Fed. R. Civ. P. 11(a) regarding prior filings," but they "recognize that the Court has not ruled on these matters." Defs.' Reply at 3. The plaintiff having timely advised the Court on September 14, 2017, that he is proceeding pro se, see Pl.'s Notice at 1, the Court concludes that the plaintiff has complied with the Court's August 31, 2017 Order and has no further obligations pursuant to it. Furthermore, as the defendants do not take issue with the plaintiff's compliance with Fed. R. Civ. P. 11(a), the Court need not address that issue.

possibility that a defendant has acted unlawfully." Id.

Although the Court "must treat the complaint's factual allegations as true [and] must grant [the] plaintiff the benefit of all reasonable inferences from the facts alleged," Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006), legal allegations devoid of factual support are not entitled to this assumption, see e.g., Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994). "In determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice." Abhe & Svoboda, Inc. v. Chao, 508 F.3d 1052, 1059 (D.C. Cir. 2007) (citation omitted). Filings by a pro se litigant "must be held to less stringent standards than [those] drafted by lawyers," Atherton v. D.C. Office of Mayor, 567 F.3d 672, 681 (D.C. Cir. 2009); however, this latitude "does not constitute a license for a plaintiff filing pro se to ignore the Federal Rules of Civil Procedure," Moore v. Agency for Int'l Dev., 994 F.2d 874, 876 (D.C. Cir. 1993) (citation omitted).

**B.    APA Claims**

The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." Fed. Commc'ns Comm'n v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009). It requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); "contrary to constitutional right, power, privilege, or immunity," id. § 706(2)(B); or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," id. § 706(2)(C). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463

U.S. 29, 43 (1983). Nonetheless, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Id. (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)). "Courts 'will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" Pub. Citizen, Inc. v. Fed. Aviation Admin., 988 F.2d 186, 197 (D.C. Cir. 1993) (quoting Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc., 419 U.S. 281, 286 (1974)).

### III.    ANALYSIS

**A.    The Plaintiff's APA Claims**

The defendants argue that the plaintiff has failed to state any claim under the APA because (1) he has failed to allege a final agency action, see Defs.' Mem. at 20–22; and (2) "[e]ven [a]ssuming [there is] a [f]inal [a]gency [a]ction," he "has not and cannot plausibly allege that [the d]efendants' actions" violated the APA, id. at 25. The Court will address each argument in turn.

**1.    Final Agency Action**

The defendant argues that the plaintiff has failed to state a claim under the APA because the "[p]laintiff's evident failures either to complete the required forms in their entirety or to appear personally before a consular officer make clear that there was no proper [ ] application before the Department and, therefore, that the Department did not render a judicially reviewable final agency action." Id. at 21. They further argue that "[t]he Department's responses [to the plaintiff] were nothing more than the informal provision of information[,] and the Department never indicated to the contrary, no matter how much [the p]laintiff tried to characterize the [ ] correspondence as a 'denial' or a 'final agency action.'" Id. The plaintiff responds that "the

13

lengthy chain of correspondence between the parties[] establishes a request by the [p]laintiff for a [Certificate of Loss of Nationality] under 8 U.S.C. [§] 1481(a)(1)," Pl.'s Opp'n at 6, and the "plain language meaning" of the words used in the Department's correspondence demonstrates that the Department "denied" his request and thereby "culminat[ed] [its] decision-making process," id. at 3.

It is well established that "a court may not review a non-final agency action." Conservation Force v. Salazar, 919 F. Supp. 2d 85, 89 (D.D.C. 2013); see also Holistic Candlers & Consumers Ass'n v. FDA, 664 F.3d 940, 943 (D.C. Cir. 2012) ("The APA . . . only provides a right to judicial review of 'final agency action for which there is no other adequate remedy in a court.'" (quoting 5 U.S.C. § 704)). "An agency action is final if it '1) marks the consummation of the agency's decision making process' and 2) affects the 'rights or obligations . . . [or the] legal consequences' of the party seeking review." Conservation Force, 919 F. Supp. 2d at 89 (omission and alteration in original) (quoting Bennett v. Spear, 520 U.S. 154, 177–78 (1997)). "[T]he finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury[.]" Darby v. Cisneros, 509 U.S. 137, 143 (1993) (alteration in original) (quoting Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 193 (1985)). "Agency action is considered final to the extent that it imposes an obligation, denies a right, or fixes some legal relationship." Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n, 324 F.3d 726, 731 (D.C. Cir. 2003) (citing Role Models Am., Inc. v. White, 317 F.3d 327, 331–32 (D.C. Cir. 2003)).

The Court concludes that the plaintiff has alleged facts sufficient to demonstrate that defendant Ferber's letters to the plaintiff's counsel constitute final agency action within the

meaning of the APA.  As to the first element of final agency action, that the action "marks the consummation of the agency's decision making process," Conservation Force, 919 F. Supp. 2d at 89, the defendants appear to argue that their actions in this case could not mark the consummation of the Department's decision making process because no such process was ever initiated, see Defs.' Mem. at 20 ("[The p]laintiff failed to apply properly to the [ ] Department for a [Certificate of Loss of Nationality], precluding an actual agency decision.").  However, the plain language of defendant Ferber's letters to the plaintiff's counsel belie this position.  First, these letters explicitly acknowledged that the plaintiff had made a "request for a [Certificate of Loss of Nationality] on the basis of [ ] section 349(a)(1)."  Am. Compl., Ex. 16 (Feb. 8, 2017 Letter) at 1 ("We reiterate that [the plaintiff]'s request for a [Certificate of Loss of Nationality] on the basis of [ ] section 349(a)(1) is unavailing[.]" (emphasis added)); see also id., Ex. 16 (Feb. 8, 2017 Letter) at 1 (explaining that the Department "ha[d] not conceded . . . any point or position related to [the plaintiff]'s request" (emphasis added)); id., Ex. 14 (Nov. 9, 2016 Letter) at 1 ("We have carefully reviewed . . . your legal arguments in support of [the plaintiff]'s request for a [Certificate of Loss of Nationality] under section 349(a)(1)" (emphasis added)). Furthermore, defendant Ferber's letters represented that the Department had "carefully reviewed" that request, including "[the plaintiff's] circumstances, the history of [his and his counsel's] correspondence with the [Embassy], and [the] legal arguments in support of [the] request."  Id., Ex. 14 (Nov. 9, 2016 Letter) at 1; see also id., Ex. 16 (Feb. 8, 2017 Letter) at 1 (representing that the Department had "reviewed [the plaintiff's counsel's] additional arguments" and providing further legal analysis).  And critically, the letters demonstrate that the Department had rendered a decision denying the plaintiff's request, by informing him that "the Department [could ]not approve a [Certificate of Loss of Nationality] for [the] plaintiff based on 349(a)(1) at

th[at] time." Id., Ex. 14 (Nov. 9, 2016 Letter) at 1; see also id., Ex. 16 (Feb. 8, 2017 Letter) at 1

("We reiterate that [the plaintiff]'s request . . . is unavailing[.]").  Indeed, defendant Ferber

referred to this determination as a "decision" in the February 8, 2017 letter.  See id., Ex. 16 (Feb.

8, 2017 Letter) at 1.  Finally, the letters demonstrate that the Department's rejection of the

plaintiff's request was final because they show that the plaintiff's request would receive no

further consideration from the Department, unless the plaintiff "properly submitt[ed] an

application . . . at some point in the future, once he is outside of the United States."  Id., Ex. 14

(Nov. 9, 2016 Letter) at 3 ("Nothing in this letter precludes [the plaintiff] from properly

submitting an application for a [Certificate of Loss of Nationality] on the basis of [section]

349(a)(1) at some point in the future once he is outside of the United States"); see also id., Ex. 16

(Feb. 8, 2017 Letter) at 1 (same).  The reality that the request would receive no further

consideration by the Department is underscored by the fact that defendant Ferber referred the

plaintiff to the Department of Homeland Security, an entirely different governmental entity, "for

applicable procedures on applying for a [Certificate of Loss of Nationality] from within the

United States."  Id., Ex. 16 (Feb. 8, 2017 Letter) at 1.  And indeed, the facts alleged by the

plaintiff suggest that the Department has taken no further action on the plaintiff's request.  See

Sw. Airlines Co. v. U.S. Dep't of Transp., 832 F.3d 270, 275 (D.C. Cir. 2016) (explaining that in

assessing finality, "[this Circuit] and the Supreme Court have looked to the way in which the

agency subsequently treats the challenged action").

   The Department's correspondence is strikingly similar to the agency correspondence at

issue in XP Vehicles, Inc. v. Department of Energy, 118 F. Supp. 3d 38 (D.D.C. 2017), in which

another member of this Court concluded that an agency had rendered a final decision.[9]  In that

_____

[9] Although that member of this Court conducted her analysis under the ripeness doctrine and not the final agency

(continued . . . )

case, the plaintiff had challenged a series of letters sent to him by the Department of Energy, in

which it had informed him that he was ineligible for a loan as a matter of law and that his

application was not substantially complete. See id. at 60. The Department of Energy had moved

to dismiss the plaintiff's complaint on the ground that its action "[was] not sufficiently final

because [it] ha[d] not yet conducted a substantive review of [the] application." Id. at 59 (internal

quotation marks omitted). In dismissing this argument, the Court concluded that

> all of these letters and statements plainly constitute a final decision of the
> [Department of Energy] rejecting [the plaintiff]'s [ ] loan application . . . . The
> [Department] stated in no uncertain terms in its letter . . . that it had 'carefully
> reviewed' [the plaintiff]'s application and had 'determined' that the proposed
> project was not eligible to receive a[] [ ] loan 'as a matter of law.' Furthermore,
> the agency also apparently determined that [the plaintiff]'s application was not
> substantially complete, and it stated that the [Department] would 'take no further
> action with respect to [the plaintiff's] application until such time as [he] ha[d]
> submitted an application that is substantially complete.' The series of letters from
> the [Department] to [the plaintiff] provide no indication that the [Department]'s
> determination regarding the status of [the plaintiff]'s application is at all tentative
> or open to any further reconsideration; indeed, the most recent correspondence
> unmistakably pushes the ball into [the plaintiff]'s court, suggesting steps that [the
> plaintiff] might take '[t]o aid in completing' its application, and thereby clearly
> indicating that the agency would not proceed to continue to evaluate its submission
> otherwise.

Id. at 61 (internal citations omitted). Here, as in XP Vehicles, defendant Ferber's letters stated

that the Department had "carefully reviewed" the plaintiff's request, Am. Compl., Ex. 14 (Nov.

9, 2016 Letter) at 1; see also id., Ex. 16 (Feb. 8, 2017 Letter) at 1 (stating that the Department

"ha[d] reviewed [the plaintiff's counsel's] additional arguments"), and rendered a "decision" that

the "Department [could ]not approve" that request, id., Ex. 16 (Feb. 8, 2017 Letter) at 1; see also

id., Ex. 14 (Nov. 9, 2016 Letter) at 1 ("[T]he Department cannot approve a [Certificate of Loss

( . . . continued)
action doctrine under the APA, she relied upon final agency action case law, noting that final agency action
"jurisprudence has been adopted as applicable to . . . ripeness analysis." XP Vehicles, 118 F. Supp. 3d at 60 n.8
(first citing Abbott Labs. v. Gardner, 387 U.S. 136, 149–50 (1967); then citing Sprint Corp. v. Fed. Commc'ns
Comm'n, 331 F.3d 952, 956 (D.C. Cir. 2003)).

of Nationality] for [the plaintiff] at this time."). Furthermore, defendant Ferber represented that the Department had arrived at this conclusion based on its application of the law to the plaintiff's request, including its legal conclusion that "the Department cannot approve a [Certificate of Loss of Nationality] based on INA 349(a)(1) while the [United States] national is residing in the United States," id., Ex. 14 (Nov. 9, 2016 Letter) at 1, i.e., that the plaintiff was "ineligible" to apply under subsection (a)(1), id., Ex. 16 (Feb. 8, 2017 Letter) at 1, and that the plaintiff "did not comply with the applicable procedures . . . while abroad prior to [his] incarceration, including [placing his] signature on the required Department . . . forms before a consular officer," and he "[could ]not do so now while he is within the United States," id., Ex. 14 (Nov. 9, 2016 Letter) at 2, i.e., contending that the plaintiff's application was not complete. And finally, defendant Ferber's letters "unmistakably push[] the ball into [the plaintiff]'s court," XP Vehicles, 118 F. Supp. 3d at 61, by instructing the plaintiff that he may "properly submit[] an application for a [Certificate of Loss of Nationality] on the basis of [§] 349(a)(1) at some point in the future, once he is outside of the United States," Am. Compl., Ex. 14 (Nov. 9, 2016 Letter) at 3, and "thereby clearly indicating that the [Department] would not proceed to continue to evaluate [his] submission otherwise," XP Vehicles, 118 F. Supp. 3d at 61.

The Court also finds that the plaintiff has sufficiently alleged the second requirement for final agency action—that the action "affects the 'rights or obligations . . . [or the] legal consequences' of the party seeking review." Conservation Force, 919 F. Supp. 2d at 89. As already explained, defendant Ferber's letters amounted to a denial of the plaintiff's request to expatriate, and one Circuit Court of Appeals—the Ninth Circuit—has concluded that "expatriation has long been recognized as a right of United States citizens," Richards v. Sec'y of State, 752 F.2d 1413, 1422 (9th Cir. 1985) (citing Preamble to the Act of July 27, 1868, ch. 249,

15 Stat. 223); id. (explaining that "[the Supreme] Court [has] placed th[at] right . . . solidly on a constitutional footing" (citing Afroyim v. Rusk, 357 U.S. 263 (1964))); see also Davis v. Dist. Dir., INS, 481 F. Supp. 1178, 1182 (D.D.C. 1979) (acknowledging that Congress enacted 8 U.S.C. § 1481 in "[r]ecogni[tion] that a citizen has a right to renounce his citizenship" (quoting Jolley v. INS, 441 F.2d 1245 (5th Cir. 1971)).[10] As the defendants do not dispute the existence of this right, the Court concludes that for purposes of resolving the defendants' motion to dismiss, the plaintiff has alleged facts sufficient to demonstrate that the defendants' decision "denie[d] [him] a right." Reliable Automatic Sprinkler Co., Inc., 324 F.3d at 731; cf. XP Vehicles, 118 F. Supp. 3d at 60 ("It is clear beyond cavil that the rejection of a request for a government benefit . . . 'fixes some legal relationship' between a private party and the government." (quoting Meredith v. Fed. Mine Safety & Health Review Comm'n, 177 F.3d 1042, 1047 (D.C. Cir. 1999)). Furthermore, the plaintiff has also sufficiently alleged that the defendants' denial of his expatriation request "inflict[ed] an actual, concrete injury." Darby, 509 U.S. at 144. According to the plaintiff, the "defendant[s'] denial has resulted in substantial and ongoing harm to [him] as it compels him to continue to associate with the United States against his wishes," Am. Compl. ¶ 5, which is a harm that this Circuit has recognized as sufficient to establish an injury in fact, see Shnitzler v. United States, 761 F.3d 33, 40 (D.C. Cir. 2014) (in prisoner's challenge to the Department's refusal to recognize his renunciation of citizenship, concluding that prisoner "ha[d] sufficiently alleged an injury in fact" for purposes of standing by alleging that he was "being required to continue his association with the United States against his wishes" (emphasis removed)).

---

[10] It appears that the District of Columbia Circuit has not ruled on the issue of whether expatriation is a right, constitutional or otherwise. See Shnitzler v. United States, 761 F.3d 33, 40 (D.C. Cir. 2014) (in assessing a plaintiff's standing, the Circuit declined to decide whether "a citizen has a fundamental constitutional right to renounce citizenship" because "[t]he resolution of th[at] dispute is a merits question, not a question of standing").

The defendants' counterarguments regarding whether the Department's decision constitutes final agency action are not persuasive. In their reply, the defendants attempt to dismiss the plain language of defendant Ferber's letters, arguing that "[w]hatever certain passages in the correspondence might state, [ ] it is clear when viewed in the context of the entire exchange that no formal application was made, and no final agency action was rendered." Defs.' Reply at 4. The defendants specifically argue that the plaintiff "cannot plausibly show that he made a formal application for a [Certificate of Loss of Nationality]," id. at 5, because the "[p]laintiff failed to complete the entire application" and has failed to allege that he "ever personally appeared overseas before a consular officer, as is necessary in order to apply," id. at 4.[11] However, the defendants appear to concede that the plaintiff submitted an "application," and indeed, the plaintiff has submitted evidence that he submitted part of at least one of the proper Department forms with his initial letter to the Embassy, see id., Ex. 6 (May 31, 2016 Letter) at 3 (attaching a Form DS-4081 filled out by the plaintiff). Their argument suggests that the real issue was simply that the application was not complete, and as the XP Vehicles court found, an agency's "determin[ation] that [a party]'s application [i]s not substantially complete" may form the basis for final agency action. See XP Vehicles, 118 F. Supp. 3d at 61. The defendants have cited no case law or authority, nor has the Court been able to locate any, to require a contrary result. The defendants further argue that when the parties' correspondence "is viewed as a whole, it is apparent that [the d]efendants were providing only informal guidance to [the p]laintiff, [ ] as a matter of courtesy and service." Defs.' Reply at 5. However, on a motion

---

[11] The defendants also assert that the plaintiff "never claims to have paid the mandatory, non-waivable fee for consular services in citizenship relinquishment cases, which is due at the time of the sworn signing before a consular officer of . . . form DS-4079," Defs.' Reply at 5; however, the defendants concede in their motion that this "omission" is "not apparent from material that can be considered at this stage of the proceedings," Defs.' Mem. at 11 n.9. Therefore, the Court will not consider this issue.

to dismiss, the Court "must treat the complaint's factual allegations as true [and] must grant [the] plaintiff the benefit of all reasonable inferences from the facts alleged." Trudeau, 456 F.3d at 193 (internal citation omitted). Therefore, for purposes of the defendants' motion, the Court must presume that defendant Ferber's letters meant what they said: that the Department had "received the plaintiff's request," "carefully reviewed" the request, and made a "decision" that it "cannot approve" the request based on its substantive analysis of the law as it applied to the plaintiff's circumstances. Am. Compl., Ex. 14 (Nov. 9, 2016 Letter) at 1; see also id., Ex. 16 (Feb. 8, 2017 Letter) at 1.

Additionally, the defendants argue that "[t]his case is, in essence, no different than several others where plaintiffs seeking different forms of expatriation failed to apply to the proper agency and, consequently, had their lawsuits dismissed." Defs.' Mem. at 21. The Court disagrees. The cases cited by the defendants, all involving plaintiffs seeking to expatriate pursuant to subsection (a)(6), are easily distinguishable because the plaintiffs in those cases never made a request to the appropriate agency in any manner and consequently, the agency took no action whatsoever. In Walker v. Holder, the plaintiff did "not allege[] that he [had] applied to [the Department of] Homeland Security or [the Department of Justice] to renounce his citizenship and was denied," 714 F. Supp. 2d 44, 47–48 (D.D.C. 2010), but rather alleged only that he wrote letters to those agencies seeking information about subsection (a)(6) and the renunciation process, see id. at 46, and that the letters were either returned as undeliverable or never received a response, see id. at 46–47. Similarly, in Kingston v. Lynch, the plaintiff "acknowledge[d] that his request to expatriate was not received by [the Department of] Homeland Security[, which was] the agency responsible for such decisions," 169 F. Supp. 3d 110, 113 (D.D.C. 2016). Finally, in Tutora v. United States Attorney General for the Eastern

District of Pennsylvania, No. 16-mc-195, 2017 WL 2126321 (E.D. Pa. May 16, 2017), the plaintiff did "not allege[] that he ha[d] submitted a renunciation request to [the agency]," but rather "s[ought] a ruling from th[e] [c]ourt in the first instance," id. at *7 (internal citation and quotation marks omitted).  Here, the plaintiff has alleged facts demonstrating that he made a request to the Department, the proper agency for submitting expatriation claims brought under subsection (a)(1), see Defs.' Mem. at 4, which the Department acknowledged receiving, and importantly, considered and determined that the request could not be approved.

Finally, to the extent that the defendants argue that their rejection of the plaintiff's request was not a final agency action because the defendants did not reach the merits of the plaintiff's expatriation claim, this argument lacks merit.  The Court agrees with the conclusion in XP Vehicles that "an agency [need not] reach and determine the underlying merits of an application or petition—as distinguished from making a determination regarding initial eligibility criteria—so long as the agency has made a final and unequivocal decision with respect to what it does review."  118 F. Supp. 3d at 60.  Moreover, "a rejection for lack of completeness and a substantive denial of an . . . application are both the end of the road from the applicant's standpoint and have the same practical effect on the applicant's rights."  Id. at 61.  Here, the plaintiff has alleged facts sufficient to demonstrate that the defendants made "a final and unequivocal decision" that the Department "cannot approve" the plaintiff's request for a Certificate of Loss of Nationality so long as he is in the United States, see Am. Compl., Ex. 14 (Nov. 9, 2016 Letter) at 1–2, which is the Department's final determination on this issue.[12]

_____

[12] The defendants have also made a cursory argument that the plaintiff's APA claim must fail because the plaintiff's "failure to allege that he properly applied . . . for a [Certificate of Loss of Nationality]" means that he "has . . . failed to exhaust his administrative remedies."  Defs.' Mem. at 22 (citing Tutora, 2017 WL 2126321, at *8).  This bare bones argument is insufficient to satisfy the defendants' burden of demonstrating that the plaintiff's APA claims must be dismissed on this ground.  See Cohen v. Bd. of Trs. of Univ. of Dist. of Columbia, 819 F.3d 476, 481 (D.C. Cir. 2016) (instructing that under Rule 12(b)(6), "the burden is on the moving party to prove that no legally

(continued . . . )

## 2. Unlawfulness of the Defendants' Actions Under the APA

The defendants additionally assert that even "assuming the [ ] Department rendered a final decision," the plaintiff "still fails to state an APA claim because he has not and cannot plausibly allege that [the d]efendants' actions were [ ] arbitrary and capricious; [ ] contrary to constitutional right, power, privilege or immunity, or [ ] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." Defs.' Mem. at 25 (citing 5 U.S.C. § 706(2)). For the reasons explained below, the Court finds that this argument does not provide a basis for dismissing the plaintiff's claims.

The plaintiff's APA claims are primarily based on his position that the requirements the defendants purported to apply in denying his request for a Certificate of Loss of Nationality—including the in-person consular appearance requirement—violate the INA. See, e.g., Am. Compl. at 11 ("Section [(a)(1)] of the INA expressly does not require a personal appearance before a consular officer[,] nor does it confer authority to prescribe the form in which the renunciation shall take place[.]" (capitalization removed)). Construing the plaintiff's amended complaint liberally, as the Court must, see Atherton, 567 F.3d at 681, the plaintiff appears to raise two separate APA claims based on this proposition of a statutory violation: (1) the defendants' actions were "not in accordance with law" under § 702(2)(A) of the APA, see Am. Compl. ¶ 28 ("[The] defendant[s are] essentially writing [s]ection 349[(a)](1) out of the statute,

---

( . . . continued)

cognizable claim for relief exists" (internal quotation marks omitted)). First, for the reasons already explained, the Tutora decision is distinguishable. Second, the defendants cannot simply rely on their lack of final agency action arguments to argue lack of exhaustion because "the judicial doctrine of exhaustion of administrative remedies is conceptually distinct from the doctrine of finality," Darby, 509 U.S. at 144, as "the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate," Williamson Cty. Regional Planning Comm'n, 473 U.S. at 193. In any event, the exhaustion requirement appears to be satisfied here because the Court concludes that the plaintiff has alleged facts sufficient to show that the Department denied the plaintiff's expatriation request, and the defendants concede that although further administrative review of such denials is available, the "availability of judicial review is not conditioned on pursuing" further administrative review of that denial. Defs.' Mem. at 8.

which is . . . not in accordance with law."), and (2) the defendants' actions were "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" under § 702(2)(C) of the APA, id. ¶ 57 (citing § 706(2)(C) in Count I of the amended complaint). Because the defendants do not argue in their motion to dismiss or their reply that the plaintiff has failed to state a claim under the "not in accordance with law" provision of § 702(2)(A) of the APA, see Defs.' Mem. at 25–28 (only explicitly addressing the "arbitrary and capricious" component of the plaintiff's § 702(2)(A) APA claim), the Court declines to dismiss this claim. See Cohen v. Bd. of Trs. of Univ. of Dist. of Columbia, 819 F.3d 476, 481 (D.C. Cir. 2016) (instructing that under Rule 12(b)(6), "the burden is on the moving party to prove that no legally cognizable claim for relief exists" (internal quotation marks omitted)); see also United States v. George Wash. Univ., 533 F. Supp. 2d 12, 19–20 (D.D.C. 2008) ("It is not the Court's responsibility to formulate the [parties'] arguments for them . . . , and it will not do so here."); Harris v. CitiMortgage, Inc., 878 F. Supp. 2d 154, 163 (D.D.C. 2012) ("[T]he defendants have not challenged the merits of [the plaintiff's] claim, and the court will not craft such arguments for them.").

Although the defendants do argue that the plaintiff has failed to state a claim that the defendants' action was "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," Defs.' Mem. at 27–28 (quoting 5 U.S.C. § 706(2)(C)), their arguments fail to demonstrate that the plaintiff's claims under this provision must be dismissed. Notably, the defendants fail to apply the legal standard under which the Court must analyze such claims. It is well settled that when a plaintiff asserts that an administrative agency's rule "violate[s] . . . a statute [that] the [agency] is charged with enforcing," the Court must "proceed in accordance with Chevron's familiar two-part test." Am. Bankers Ass'n v. Nat'l Credit Union Admin., 271

F.3d 262, 267 (D.C. Cir. 2001); see also Ass'n of Private Sector Colls. & Univs. v. Duncan, 681

F.3d 427, 441 (D.D.C. 2012) (instructing that challenges to agency rules under § 706(2)(C) "are

reviewed under the well-known Chevron framework"). As this Circuit has explained, the

Chevron test requires the Court to

> [f]irst, [ ] analyze the statute applying customary rules of statutory interpretation. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." If [the Court] conclude[s] that "the statute is silent or ambiguous with respect to the specific issue," however, [it] must next determine the deference, if any, [it] owe[s] the agency's interpretation of the statute. If the agency enunciates its interpretation through notice-and-comment rule-making or formal adjudication, [the Court] give[s] the agency's interpretation Chevron deference. That is, [it] determine[s] whether [the agency's] interpretation is "permissible" or "reasonable," giving "controlling weight" to the agency's interpretation unless it is "arbitrary, capricious, or manifestly contrary to the statute." On the other hand, if the agency enunciates its interpretation through informal action that lacks the force of law, we accept the agency's interpretation only if it is persuasive.

Mount Royal Joint Venture v. Kempthorne, 477 F.3d 745, 754 (D.C. Cir. 2007) (internal

citations omitted).[13] Although the defendants assert in their memorandum that "[g]enerally an

agency's interpretation of the statute which that agency administers is entitled to deference under

Chevron U.S.A. Inc. v. NRDC, 467 U.S. 837 (1984)," Defs.' Mem. at 20, they do not purport to

apply the Chevron analysis to this case.

Notwithstanding their failure to explicitly address the Chevron standard, the arguments

raised by the defendants in their motion are insufficiently developed to demonstrate that the

plaintiff's APA claims would fail under that standard. First, as to Chevron step one, the

defendants do not explicitly assert that the INA speaks directly to whether the plaintiff must

---

[13] The defendants do not assert that the Secretary's interpretation of his own regulations is at issue. See generally Defs.' Mot.; Defs.' Reply. Such interpretations require the Court to apply the "substantial deference" test, where "judicial deference towards an agency's interpretation is warranted only when the language of the regulation is ambiguous[, and t]he agency's interpretation [ ] will prevail unless it is erroneous or inconsistent with the plain terms of the disputed regulation." In re Sealed Case, 237 F.3d 657, 667 (D.C. Cir. 2001) (internal citation and quotation marks omitted).

appear in person before a consular officer in a foreign state in order to apply for a Certificate of Loss of Nationality under subsection (a)(1). They merely argue that the "in-person sworn signature requirements on the DS-4079 and DS-4081 forms assure compliance with [statutory] limitations on the [ ] Department's authority to recognize expatriation only as to individuals outside of the United States." Defs.' Reply at 6 (citing 8 U.S.C. §§ 1104(a)(3), 1483(a)); see also Defs.' Mem. at 27 (asserting that the Secretary's authority to recognize expatriation is subject to "geographical limitations . . . [that do not] allow [him] to adjudicate [Certificate of Loss of Nationality] requests from United States citizens located within the United States"). This argument falls far short of asserting that the INA speaks directly to the in-person consular appearance requirement.

Second, as to <u>Chevron</u> step two, the defendants do not assert that the in-person consular appearance requirement is entitled to any level of deference from this Court. Given that the plaintiff explicitly argues in his opposition that "the [d]efendant[s'] interpretation[s] of the INA are . . . not entitled to <u>Chevron</u> deference," Pl.'s Opp'n at 6, the Court finds that the defendants' have conceded for purposes of this motion that the Secretary's rules are not entitled to that particular level of deference, see <u>Day v. D.C. Dep't of Consumer & Regulatory Affairs</u>, 191 F. Supp. 2d 154, 159 (D.D.C. 2002) (recognizing that a court may "treat[] the plaintiffs' arguments made in opposition to the defendant's motion to dismiss as conceded [if] the defendant 'failed to respond to these arguments in its reply memorandum'" (quoting <u>Lewis v. United States</u>, No. 90-cv-991, 1990 WL 179930, at *2 (D.D.C. Oct. 29, 1990))). In any event, the arguments raised in the defendants' motion fail to demonstrate that <u>Chevron</u> deference is appropriate. Although the defendants argue that "Congress has delegated [ ] authority with respect to subsections (a)(1) through (a)(5) to the Secretary," Defs.' Reply at 8, and that the Secretary implemented the

in-person consular appearance requirement pursuant to that authority, <u>see</u> Defs.' Mem. at 25,

<u>Chevron</u> deference is only accorded to "rules carrying the force of law," <u>Gonzales v. Oregon</u>,

546 U.S. 243, 255–56 (2006), and the forms and Manual provisions that the defendants cite as

the source of the requirement, <u>see, e.g.</u>, Defs.' Mem. at 6, do not qualify as such rules, <u>see</u>

<u>Christensen v. Harris Cty.</u>, 529 U.S. 576, 587 (2000) ("[I]nterpretations contained in policy

statements, agency manuals, and enforcement guidelines, all of which lack the force of law[,] do

not warrant <u>Chevron</u>-style deference.").  Moreover, the defendants do not present their

arguments in a manner that makes it readily discernible to the Court that the in-person consular

appearance requirement is entitled to any lower level of deference under the applicable standards

for such deference.  <u>See</u> <u>Mount Royal Joint Venture</u>, 477 F.3d at 754 ("[I]f the agency enunciates

its interpretation through informal action that lacks the force of law, we accept the agency's

interpretation only if it is persuasive."); <u>see also</u> <u>Ctr. for Biological Diversity v. Jackson</u>, 815 F.

Supp. 2d 85, 90 (D.D.C. 2011) (explaining that the "power to persuade" requires the Court to

analyze "the thoroughness evident in the agency's consideration, the validity of its reasoning,

and its consistency with earlier pronouncements," as well as "the specialized experience and

broader investigations and information available to the agency, and [ ] the value of uniformity in

its administrative and judicial understandings of what a national law requires" (first citing

<u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 140 (1944); then citing <u>United States v. Mead Corp.</u>,

533 U.S. 218, 234 (2001)).

Furthermore, to the extent the defendants argue that the in-person consular appearance

requirement is immune to challenge because "[c]ourts have consistently held that . . .

[s]ubsections (a)(1) through (a)(5) all require the person seeking to relinquish [United States]

citizenship to be in a foreign country," Defs.' Mem. at 27, none of the decisions cited for this

proposition in defendant Ferber's letters command this result, see Am. Compl., Ex. 14 (Nov. 9, 2016 Letter) at 1–2 (first citing <u>Sluss v. USCIS</u>, 899 F. Supp. 2d 37, 42 (D.D.C. 2012); then citing <u>Kwok Sze v. Johnson</u>, 172 F. Supp. 3d 112 (D.D.C. 2016); then citing <u>Keene v. U.S. Dep't of Homeland Sec.</u>, No. 16-cv-94, 2016 WL 2343250 (N.D. Fla. Apr. 22, 2016)).  Indeed, none of these decisions even addresses a request for expatriation pursuant to subsection (a)(1).  Instead, they simply found that prisoners, who had not alleged they had taken any act under subsections (a)(1) through (a)(5) prior to their incarceration, could not lose their nationality while incarcerated in the United States except pursuant to subsection (a)(6), which was unavailable to them because it required appearing for an in-person interview at a designated office of the United States Citizenship and Immigration Services ("USCIS").  <u>See</u> <u>Sluss</u>, 899 F. Supp. 2d at 41 (finding that prisoner seeking expatriation pursuant to subsection (a)(6) failed to state a claim under the APA because he had not complied with the in-person USCIS interview requirement); <u>Kwok Sze</u>, 172 F. Supp. 3d at 120–21 (same); <u>Keene</u>, 2016 WL 2343250, at *3 (same).

In sum, the defendants' arguments are insufficient to satisfy their "burden . . . to prove that no legally cognizable claim for relief exists" under § 706(2)(C) of the APA.  <u>Cohen</u>, 819 F.3d at 481 (internal quotation marks omitted).  Consequently, the Court must deny their motion to dismiss these claims at this time.  <u>See</u> <u>Campbell v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.</u>, 130 F. Supp. 3d 236, 262 (D.D.C. 2015) ("In the absence of any developed argument from [the d]efendants, the Court will not dismiss the [plaintiff's] claim . . . at this time."); <u>see also</u> <u>Saunders v. District of Columbia</u>, 711 F. Supp. 2d 42, 55 (D.D.C. 2010) ("declin[ing] to make a ruling" on an issue at the motion to dismiss stage "[g]iven the inadequacy of the parties' briefing and the importance of th[e] issue").[14]

---

[14] The defendants also argue that the plaintiff's claim under § 706(2)(C) of the APA must fail because the INA

(continued . . . )

The defendants further argue that the plaintiff cannot allege that the defendants' "refusal to entertain [the plaintiff's] [ ] application" was "arbitrary and capricious" under § 706(2)(A) of the APA because that refusal was based on the plaintiff's "failure to comply with th[e] regulations, policies, standard[s], and publicly-available procedures" created by the Secretary pursuant to his statutory authority, and therefore, was "reasoned and rational." Defs.' Mem. at 26. However, this argument does not foreclose the plaintiff's arbitrary and capricious claim, as this Circuit has recognized that the Court's arbitrary and capricious inquiry "depends not solely on the agency's authority, but instead on the agency's ability to demonstrate that it engaged in reasoned decisionmaking." Animal Legal Def. Fund, Inc. v. Perdue, 872 F.3d 602, 619 (D.C. Cir. 2017) ("[A]gency action may be consistent with the agency's authorizing statute and yet arbitrary and capricious under the APA."). Construing the plaintiff's complaint liberally, as the Court has noted it must, see Atherton, 567 F.3d at 681, the plaintiff has alleged that the Secretary has not engaged in reasoned decisionmaking in this case, see, e.g., Am. Compl. ¶ 46 (asserting that the defendants "erroneously relied on previous court holdings which are completely distinguishable from [the] plaintiff's claim"); id. ¶ 45 (asserting that the Secretary, despite claiming in this case that "the Department cannot approve a [Certificate of Loss of Nationality] based on [subsection] (a)(1) while a [United States] national is residing in the United States," has at least once before "approved and served [Certificates of Loss of Nationality] to [a person] while he was physically on [United States] soil" (citing Richards, 752 F.2d 1413). Although the

_____

( . . . continued)
forecloses the plaintiff's theory that "loss [of nationality] occurs automatically without the Department's approval," Defs.' Mem. at 27, i.e., that the Secretary may not impose any additional requirements on expatriation beyond what is stated in the INA, see Defs.' Mem. at 27–28 (arguing that "[§] 1481(a)(1) does not produce loss of citizenship in a vacuum by operation of law" because "§ 1501 requires approval by the Secretary . . . before a [Certificate of Loss of Nationality] is final"). Even if the Court agreed with the defendants on this point, that would not negate the viability of the plaintiff's claim because it does not resolve the question of whether the Secretary may impose an in-consular appearance requirement on the plaintiff. Therefore, the Court need not resolve at this time the broader question of whether the Secretary may impose any additional requirements beyond what is contained in the statute.

defendants in their reply refute at least one of the grounds for the plaintiff's arbitrary and capricious claim, see Defs.' Reply at 6 n.4 (asserting that Richards is distinguishable), the Court concludes that it cannot dismiss the plaintiff's arbitrary and capricious claim at this time. As this Circuit has recognized, "in order to allow for meaningful judicial review, [an] agency must produce an administrative record that delineates the path by which it reached its decision." Occidental Petroleum Corp. v. SEC, 873 F.2d 325, 339 (D.C. Cir. 1989). Because the defendants have requested that the Court defer their obligation to produce an administrative record until after adjudication of their motion to dismiss, see Defs.' Rule 7(n) Mot. ¶ 4, which the Court has yet to rule upon, the Court does not have a complete administrative record before it at this time. Consequently, the Court cannot properly evaluate the plaintiff's claims that the defendants acted arbitrarily and capriciously. See Swedish Am. Hosp. v. Sebelius, 691 F. Supp. 2d 80, 88 (D.D.C. 2010) (in APA case, concluding that "[t]he court [wa]s unable to assess the merits of [the defendant's motion to dismiss] arguments without considering the administrative record" because the plaintiff "[wa]s challenging not just whether the Secretary's regulations were consistent with the statute, but also whether the Secretary's adjudicatory process was reasonable and whether the decision was consistent with Congressional intent"); see also Vargus v. McHugh, 87 F. Supp. 3d 298, 302 (D.D.C. 2015) (in APA case involving arbitrary and capricious claim, ordering the government to produce a complete administrative record because the court "cannot fully evaluate" the government's arguments in its motion to dismiss "without the [a]dministrative [r]ecord," regardless of "[w]hether . . . th[o]se points [were] dispositive of [the p]laintiff's claims").

Finally, in a two-sentence paragraph, the defendants argue that the plaintiff has failed to state a claim that the defendants' denial of the plaintiff's request was "contrary to constitutional

right, privilege or immunity" because "[t]he [ ] application process set forth in Departmental regulation[s] and the . . . Manual advances rather than impedes rights, powers, and privileges regarding expatriation by ensuring that a claimant's alleged relinquishment of United States citizenship was done voluntarily and intentionally."  Defs.' Mem. at 26.  This cursory argument does not satisfy the defendants' burden under Rule 12(b)(6).  See Cohen, 819 F.3d at 481; see also Jericho Baptist Church Ministries, Inc. (District of Columbia) v. Jericho Baptist Church Ministries, Inc. (Maryland), 223 F. Supp. 3d 1, 8 (D.D.C. 2016) (declining to consider a defendant's argument that a plaintiff's claim should be dismissed because "[i]t is not enough merely to mention a possible argument in the most skeletal way, leaving the [C]ourt to do counsel's work" (quoting N.Y. Rehab. Care Mgmt., LLC v. NLRB, 506 F.3d 1070, 1076 (D.C. Cir. 2007)).  Notably, the defendants do not argue that expatriation is not a constitutional right, and as already explained, the Ninth Circuit has concluded that expatriation is indeed a constitutional right.  See Richards, 752 F.2d at 1422 ("[The Supreme] Court [has] placed the right of voluntary expatriation solidly on a constitutional footing." (citing Afroyim, 357 U.S. 263).  And the defendants have not adequately refuted the plaintiff's claim that the defendants' actions have denied him this right, see, e.g., Am. Compl. ¶ 53 (alleging that "the Secretary's final agency action . . . has [ ] denied [him] the right to expatriation"), as they have offered no explanation as to how their imposition of limitations on a person's ability to expatriate in fact "advances" the right to expatriation.  Consequently, the Court declines to dismiss the plaintiff's APA claim under § 706(2)(B).[15]

---

[15] In declining to address legal issues not adequately raised by the defendants in relation to the plaintiff's claim under § 706(2)(B), the Court is also guided by the "fundamental rule of judicial restraint" that courts should "not reach constitutional questions in advance of the necessity of deciding them."  Empresa Cubana Exportadora de Alimentos y Productos Varios v. U.S. Dep't of Treasury, 516 F. Supp. 2d 43, 59 (D.D.C. 2007) (quoting Three Affiliated Tribes of Ft. Berthold Reservation v. Wold Eng'g, 467 U.S. 138, 157 (1984)).

**B.      The Defendants' Other Arguments**

The defendants further argue that any claims for mandamus and declaratory relief raised by the plaintiff must also fail.  Defs.' Mem. at 22–23.  Again, the defendants have failed to meet their burden to demonstrate that these claims must be dismissed under Rule 12(b)(6).

First, the defendants argue that "[i]n the absence of a proper, complete [ ] application, [ ] no cause of action for declaratory relief accrues."  Id. at 22 (first citing Walker v. Holder, 430 F. App'x 1, at *1 (D.C. Cir. 2011); then citing Kwok Sze v. Kelly, No. 16-5090, 2017 WL 2332592, at *1 (D.C. Cir. Feb. 21, 2017)).  However, the defendants offer no further analysis. Rather, they merely rely on cases in which courts have concluded that declaratory relief was unavailable either because the plaintiff had never submitted any request for a Certificate of Loss of Nationality, see Walker, 430 F. App'x at 1 (concluding that the plaintiff was not entitled to declaratory relief where he had "never submitted a written application for a passport" and therefore the case "lack[ed] the 'immediacy and reality to warrant the issuance of a declaratory judgment'" (quoting MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 126 (2007))), or because the plaintiff had not yet received a final decision on his request, see Kwok Sze, 2017 WL 2332592, at *1 (concluding that the plaintiff was not entitled to a declaration that "he ha[d] successfully renounced his citizenship" because "he ha[d] not . . . received a final decision on his request [for renunciation]").  However, neither situation exists here, as the Court has concluded that the plaintiff has alleged facts sufficient to demonstrate that he submitted a request for a Certificate of Loss of Nationality and the Department denied that request.  Furthermore, given that the Court has determined that dismissal of the plaintiff's APA claims is not appropriate at this time, it would be premature for the Court to rule that the plaintiff is not entitled to the declaratory relief he seeks, which is explicitly tied to those APA claims.  See Am. Compl. at 25

(requesting that the Court "[d]eclare that the [d]efendants have violated [the p]laintiff's right to expatriation under [subsection] (a)(1)" and "that [the d]efendants have acted arbitrarily, capriciously and unreasonably . . . [and] contrary to law").

Similarly, the defendants argue that the plaintiff cannot state a claim for mandamus relief because he "fail[ed] to properly apply for a [Certificate of Loss of Nationality]," and therefore, "[the d]efendants have no obligation to act." Defs.' Mem. at 23 (citing Tutora, 2017 WL 2126321, at *8). The plaintiff seeks a "[j]udicial order requiring [the d]efendants to issue to [the p]laintiff a Certificate of Loss of U.S. Nationality." Am. Compl. at 26. As the case cited by the defendants recognizes, a plaintiff "is entitled to [mandamus] relief . . . only if the defendant owes him a clear, nondiscretionary duty," Tutora, 2017 WL 2126321, at * 8 (quoting Heckler v. Ringer, 466 U.S. 602, 616 (1984)), and although judges of this Court "have frequently held that the only ministerial duty owed by USCIS under [s]ubsection (a)(6) is to respond to the renunciant's request," id. (quoting Kwok Sze, 172 F. Supp. 3d at 119), the defendant has not cited any decision evaluating the availability of mandamus relief based on the Department's obligations as to expatriation claims brought under subsection (a)(1). Because the extent of the Department's discretion in considering a request for a Certificate of Loss of Nationality pursuant to subsection (a)(1) is an issue disputed by the parties with respect to the plaintiff's APA claims, and because the Court has declined to dismiss those claims at this time, the Court declines to decide this issue in the context of the plaintiff's mandamus claim in the absence of a more developed argument on mandamus by the defendants. See Campbell, 130 F. Supp. 3d at 262.

Having concluded that the defendants have not demonstrated that the plaintiff's claims must be dismissed, the Court must address two final matters. First, the Court will deny as moot the defendants' motion for relief from Local Civil Rule 7(n), which "seek[s] suspension of the

33

requirements to file a certified administrative record or an appendix [ ] pending a ruling on

[their] [m]otion to [d]ismiss." Defs.' Rule 7(n) Mot. ¶ 4. Because the Court concludes that it

must deny the defendants' motion to dismiss, and therefore, the Court's ruling on that motion is

no longer pending, the relief requested by the defendants is no longer necessary. Accordingly,

the Court will order the defendants to now comply with the requirements of Local Civil Rule

7(n). Second, because the defendants have yet to respond to the plaintiff's motion for summary

judgment, which raises many of the same legal issues which the Court has determined were

inadequately addressed in the defendants' motion to dismiss, the Court does not find it

appropriate to consider the plaintiff's motion at this time. Instead, the Court will order the

defendant to respond to the plaintiff's motion.[16]

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that it must deny the defendants' motion

to dismiss at this time because the plaintiff has adequately alleged that the Department rejected

his request for a Certificate of Loss of Nationality and thereby took final agency action within

---

[16] The plaintiff requests that the Court deny the defendants the opportunity to "cure [their] failure to follow [Local Civil Rule] 7(n)" and "accept the existing administrative record as complete," presumably referring to the exhibits attached to the plaintiff's Amended Complaint, Pl.'s Opp'n at 1, arguing that the defendants should not be permitted to file "[their] version of the record after the fact and with additional delays in the process," id. The plaintiff further requests that the Court deny the defendants an extension of time in which to respond to his motion for summary judgment because the defendants did not file a motion for extension of time in accordance with this Court's general order governing civil cases. See id. at 2. The Court rejects these requests for three reasons. First, the plaintiff has not argued that he will be prejudiced by any delay caused by allowing the defendants to now comply with Rule 7(n) and respond to the plaintiff's summary judgment motion, and no such prejudice is apparent to the Court. Second, this Court "enjoys broad discretion in managing its docket and determining the order in which a case should proceed," Grimes v. District of Columbia, 794 F.3d 83, 90 (D.C. Cir. 2015), and it has determined, in its discretion, that proceeding in this manner is an appropriate means for resolving this case. Third, in the absence of confirmation from the defendants that the exhibits to the plaintiff's Amended Complaint comprise a complete administrative record, see Defs.' Mem. at 29 n.23 (only asserting that "there is no need to refer to an administrative record to adjudicate this motion"), the Court must assume that the exhibits represent only a partial record, and this Circuit has instructed that "[f]or review to go forward on a partial record, [the Court] would have to be convinced that the selection of particular portions of the record was the result of mutual agreement between the parties after both sides had fully reviewed the complete record," Walter O. Boswell Mem'l Hosp. v. Heckler, 749 F.2d 788, 793 (D.C. Cir. 1984). And, in addition to lacking sufficient information to make that determination at this time, the defendants' request to defer the filing of the administrative record suggests that the entire record is not before the Court.

the meaning of the APA, and the defendants have failed to demonstrate that the plaintiff's APA, mandamus, or declaratory relief claims must be dismissed at this time. Additionally, the Court concludes that it must deny as moot the defendants' motion for relief from Local Civil Rule 7(n), and order the defendants to comply with the requirements of that Rule and respond to the plaintiff's motion for summary judgment.

**SO ORDERED** this 16th day of April, 2018.

REGGIE B. WALTON
United States District Judge