# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————————
)
GERALD LEE FARRELL,          )
)
         Plaintiff,      )
)
    v.          )     Civil Action No. 17-490 (RBW)
)
MICHAEL R. POMPEO, in his official  )
capacity as Secretary of State of the  )
United States, <u>et al.</u>,        )
)
        Defendants.   )
)
———————————————————————

## <u>MEMORANDUM OPINION</u>

The <u>pro se</u> plaintiff, Gerald Lee Farrell, brings this civil action against the defendants,

Michael R. Pompeo, the Secretary of the United States Department of State (the "Secretary"),

and Corrin Ferber, Director of the Office of Legal Affairs, Bureau of Consular Affairs of the

United States Department of State ("the Department"), alleging that the defendants' denial of his

request for a Certificate of Loss of Nationality violated the Immigration and Nationality Act

("INA"), 8 U.S.C. §§ 1101–1537 (2012), 18 U.S.C. § 1429 (2012), and the Administrative

Procedure Act ("APA"), 5 U.S.C. §§ 701–706 (2012). <u>See generally</u> Amended Complaint ("Am.

Compl."). Currently before the Court are the parties' cross-motions for summary judgment. <u>See</u>

Motion for Summary Judgment ("Pl.'s Mot."); Cross-Motion for Summary Judgment ("Def.'s

Cross-Mot."). Upon consideration of the parties' submissions,[1] the Court concludes that it must

deny the plaintiff's motion and grant the defendants' motion.

---

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) Defendants' Motion to Dismiss ("Defs.' Mot. to Dismiss"); (2) the Plaintiff's Response Opposing Defendant[]s['] Motion to Dismiss ("Pl.'s Opp'n to Mot. to Dismiss"); (3) the Defendants' Reply to Plaintiff's Response Opposing Defendants' Motion to Dismiss; (4) the defendants' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendants' Cross-Motion for Summary Judgment ("Def.'s

(continued . . . )

# I.   BACKGROUND

## A.   Statutory and Regulatory Framework

Section 349 of the INA provides that "a national of the United States whether by birth or naturalization, shall lose his nationality by voluntarily performing any [one] of [seven] acts with the intention of relinquishing United States nationality."  8 U.S.C. § 1481(a).  These acts are codified in subsections (a)(1) through (a)(7) of 8 U.S.C. § 1481.  With regards to subsections (a)(1) through (a)(5), the statute provides that

> no national of the United States can lose United States nationality . . . while within the United States . . . but loss of nationality shall result from the performance within the United States . . . of any of the acts or the fulfillment of any of the conditions specified in [§ 1481(a)(1) through (a)(5)] if and when the national thereafter takes up a residence outside the United States[.]

Id. § 1483(a).  At issue in this case is subsection (a)(1), which provides that an individual "shall lose his nationality by voluntarily . . . [, and] with the intention of relinquishing United States nationality[,] . . . obtaining naturalization in a foreign state upon his own application or upon an application filed by a duly authorized agent, after having attained the age of eighteen years."  Id. § 1481(a)(1).[2]  Under the INA,

> [w]henever a diplomatic or consular officer of the United States has reason to believe that a person while in a foreign state has lost his United States nationality under [8 U.S.C. § 1481] . . . , he shall certify the facts upon which such belief is

---

( . . . continued)
Mem."); (5) the Reply in Support of Plaintiff's Motion for Summary Judgment and Opposition to the Defendant[]s['] Cross-Motion for Summary Judgment ("Pl.'s Reply"); (6) the Defendants' Reply in Support of Cross-Motion for Summary Judgment ("Defs.' Reply"); (7) a September 5, 2018 letter from the plaintiff to the Court (Sept. 5, 2018), ECF No. 37 ("Sept. 5, 2018 Letter"); (8) the Defendants' Response to September [5], 2018[] Letter from Plaintiff (Oct. 1, 2018), ECF No. 38; (9) a September 22, 2018 letter from the plaintiff to the Court (Sept. 22, 2018), ECF No. 39; (10) the Defendants' Response to September [22], 2018 Letter from Plaintiff (Nov. 2, 2018), ECF No. 40; (11) a February 20, 2019 letter from the plaintiff to the Court (Feb. 20, 2019), ECF No. 41; (12) the Defendants' Notice of Supplemental Authority ("Defs.' Not."); (13) the plaintiff's response to the Defendants' Notice of Supplemental Authority; (14) the Defendants' Response to the Court's May 20, 2019 Order ("Defs.' Resp."); and (15) the plaintiff's Reply to Defendants' Response to the Court's Order from 20th, May 2019 ("Pl.'s Resp.").

[2] Under the INA, "naturalization" is defined as "the conferring of nationality of a state upon a person after birth, by any means whatsoever."  8 U.S.C. § 1101(a)(23).

> based to the Department . . . , in writing, under regulations prescribed by the Secretary[.] If the report of the diplomatic or consular officer is approved by the Secretary . . . , the diplomatic or consular office in which the report was made shall be directed to forward a copy of the certificate to the person to whom it relates. Approval by the Secretary . . . of a certificate . . . shall constitute a final administrative determination of loss of United States nationality[.]

Id. § 1501. The certificate to which the statute refers is known as a "Certificate of Loss of Nationality." See, e.g., 7 Foreign Affairs Manual § 1227(a) (instructing consular officers to prepare a "Certificate of Loss of Nationality" when they "have reason to believe that [an] individual has committed an expatriating act voluntarily and with the intention of relinquishing [United States] nationality"); see also Weber v. U.S. Dep't of State, 885 F. Supp. 2d 46, 50 (D.D.C. 2012) (referring to the "certificate" described in § 1501 as a Certificate of Loss of Nationality).

With respect to loss of nationality under the INA, the Secretary has promulgated a number of regulations, including 22 C.F.R. § 50.40, which provides that the Secretary will "presume[]" that a citizen who obtains naturalization in a foreign state pursuant to subsection (a)(1) "inten[ds] to retain [United States] citizenship." 22 C.F.R. § 50.40(a) (2017). However, if that citizen "affirmatively asserts to a consular officer, after he . . . has committed [the] potentially expatriating act, that it was his . . . intent to relinquish [United States] citizenship," then the presumption is rebutted and the regulation provides that the citizen "will lose his . . . citizenship." Id.

The Secretary has also provided specific guidance to consular officers regarding loss of nationality claims in his Foreign Affairs Manual (the "Manual" or "FAM"). Relevant to subsection (a)(1), the Manual provides that if consular officers considering a claim brought under subsection (a)(1) "become aware [that] a citizen acquired foreign nationality [a]nd[] the citizen asserts or advises [them] . . . that [his] intent was to relinquish [United States] citizenship," then

"[t]he administrative presumption of intention to retain [United States] nationality is inapplicable[ a]nd[] it is necessary to develop the case and assess [the] voluntariness and intent." 7 FAM § 1221, Exhibit ("Ex.") 1 (Loss-of-Nationality Flow Chart ("Flow Chart")). In such situations, the Manual instructs a consular officer to send a letter to the citizen that "[p]rovide[s] [him with a copy of] . . . Form DS-4079, Questionnaire: Information for Determining Possible Loss of [United States] Citizenship," id., and request that he "fill out . . . and [ ] submit [the] form," 7 FAM § 1224.3(2). The Manual also instructs a consular officer to "arrange to interview the citizen," 7 FAM § 1221, Ex. 1 (Flow Chart), and more generally instructs that "it may be necessary to contact the [citizen] to discuss next steps and clarify any issues that arise in reviewing the responses to Form DS-4079" but that "[c]onsular officers can be flexible in determining whether this should include an in person, telephone[,] or e-mail contact," 7 FAM § 1224.5. Finally, to prepare a Certificate of Loss of Nationality, the Manual instructs consular officers to assemble and submit a package containing, inter alia, Form DS-4079 and Form DS-4081, which is a "Statement of Understanding Concerning the Consequences and Ramifications of Relinquishment or Renunciation of [United States] Citizenship." 7 FAM § 1227(a)(3)–(4). Both Forms DS-4079 and DS-4081 instruct citizens to sign the forms in the presence of a consular officer (the "in-person appearance requirement"). See Administrative Record ("AR") 107 (Form DS-4079 instructing applicants to sign the form "before a [c]onsular [o]fficer at a [United States] Embassy or Consulate"); see also AR 109 (Form DS-4081 requiring consular officers to attest that the citizen "appeared personally . . . and signed th[e] statement . . . before [the officer]").

**B.    Factual and Procedural History**

The plaintiff is a United States citizen by birth.  See AR 13.  In 2014, the plaintiff

pleaded guilty in the United States to federal criminal charges and was sentenced to a term of

incarceration of ninety-six-months.  See Judgment in a Criminal Case at 1–2, United States v.

Farrell, Crim. Action No. 4-180-BLW (D. Idaho June 25, 2014), ECF No. 48.[3]  He is currently

serving his prison sentence at the Federal Correctional Institution in Yazoo City, Mississippi.

See Find an Inmate, Fed. Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited Aug.

26, 2019).

On June 20, 2016, an individual designated by the plaintiff as having power of attorney to

act on his behalf (the "plaintiff's power of attorney") forwarded to then-United States

Ambassador to Switzerland Susan LeVine (the "Ambassador") a letter from the plaintiff

requesting that the Ambassador issue the plaintiff a Certificate of Loss of Nationality pursuant to

§ 1481(a)(1).  See AR 5.[4]  In the letter, the plaintiff represented that he "became [a] Swiss

[citizen] in 2004," having been issued a Swiss passport in that year, and that he did so

"voluntarily and with the intent to irrevocably lose [his] United States citizenship."  AR 5.  In

support of his position, the plaintiff attached several documents, including an affidavit in which

he stated that he had voluntarily "applied for citizenship in . . . Switzerland, while on Swiss soil

with the intent of losing [his] citizenship of the United States," AR 7, as well as what purports to

---

[3] The Court takes judicial notice of the judgment entered in the plaintiff's federal criminal case.  See HTC Corp. v. IPCom GmbH & Co., KG, 671 F. Supp. 2d 146, 151 n.3 (D.D.C. 2009) ("A court may take judicial notice of court documents and other public records." (citing Covad Comms. Co. v. Bell Atl. Corp., 407 F.3d 1220, 1222 (D.C. Cir. 2005)).

[4] The plaintiff also invoked subsections (a)(2) and (a)(5) of § 1481 in his May 31, 2016 letter to the Ambassador, see AR 5; however, none of his counsel's subsequent communications with the Department reference these subsections, see generally AR 17–27, 29–32, 35–47, 51–63.  And, the plaintiff does not base his claims in this Court on these subsections.  See, e.g., Am. Compl. ¶ 9 (asserting that he "seeks a judicial determination of his loss of [United States] [n]ationality on the basis of his performance of [subsection] (a)(1)").  Thus, the Court need not consider these subsections in resolving this case.

be a Form DS-4081 filled out by him and notarized by a Texas-commissioned notary public, AR 15.

On June 22, 2016, an unnamed representative of the American Citizen Services Section of the United States Embassy in Switzerland (the "Embassy") responded by letter to the person acting with power of attorney on the plaintiff's behalf. See AR 16. In the response, the Embassy representative explained that because a "[United States] passport was issued to [the plaintiff] in 2013[, after he] acquired Swiss nationality in 2004, . . . expatriation d[id] not apply in his case." AR 16. However, the representative advised that if the plaintiff "should now choose to renounce his [United States] nationality," he could do so by "renounc[ing] [ ] in the presence of a consular officer; [ ] outside [of] the United States; and [ ] in the precise form prescribed by the Secretary of State." AR 16. By letter dated July 21, 2016, the plaintiff's counsel at that time informed the Ambassador that her "denial to issue [the plaintiff] a Certificate of Loss of Nationality was solely based on a misunderstanding of the origin of the alleged 2013 [United States p]assport, which was actually solely requested and obtained by the [United States] Government," AR 18, "presumably . . . for [the plaintiff's] extradition . . . to the United States," AR 19. The plaintiff's prior-counsel represented that "[i]n 2004, [the plaintiff] voluntarily became a citizen of Switzerland . . . pursuant [to] . . . § 1481(a)(1)," and argued that "[t]he loss of [the plaintiff's] United States nationality was effective immediately, not when it is administratively or judicially determined." AR 17.

By letter dated August 9, 2016, the Vice Consul for the Embassy (the "Vice Consul") responded to the plaintiff's prior -counsel's letter, explaining that "to pursue expatriation . . . , [the plaintiff] would have to come to the Embassy in [Switzerland] to sign [F]orm DS-4081 . . . in person in front of a consular officer," as well as "complete . . . the enclosed [F]orm DS-

4079 . . . and send [it] to [the Embassy]." AR 28. The plaintiff's prior-counsel responded, reiterating his "legal position for [the plaintiff]'s 2004 expatriation" and incorporating from his July 21, 2016 letter "all [of] the relevant statutes, . . . [r]egulations and controlling case law [ ] substantiat[ing] []his position." AR 30. The Vice Consul again responded and asserted that "[United States] citizens cannot lose [United States] nationality while within the United States on the basis of . . . [subsection] (a)(1)." AR 33 (citing 8 U.S.C. § 1483(a)). The plaintiff's prior-counsel then sent a final letter to the Vice Consul, dated September 14, 2016, restating his position and requesting that the Vice Consul "consult internally with a legal officer before making a final denial [of the plaintiff]'s . . . request." AR 37.

Then, by letter dated September 19, 2016, the plaintiff's prior-counsel informed the Director of the Bureau of Consular Affairs of the Department (the "Director") that the plaintiff "ha[d] been informally denied by [the] Consulate in [Switzerland] the issuance of a Certificate of Loss of Nationality," AR 42, and requested "a reevaluation by the Department of th[e] informal decision," AR 45. In the letter, the plaintiff's prior-counsel argued that "there is no personal appearance requirement" for an act committed under subsection (a)(1), "only a written affirmation" requirement. AR 42. In support of his position, the plaintiff's prior-counsel attached a notarized copy of the plaintiff's Swiss passport, see AR 47, and purported to attach the plaintiff's affidavit "confirming his voluntary commission in 2004 of [an expatriating act under subsection (a)(1)] on Swiss soil [and] his intent to lose his [United States] nationality," AR 41.

By letter dated November 9, 2016, defendant Ferber responded to the plaintiff's prior-counsel, informing him that the Department had "carefully reviewed [his] explanation of [the plaintiff]'s circumstances, the history of [his] correspondence with the [Embassy] . . . , and [his] legal arguments in support of [the plaintiff]'s request [for] a [Certificate of Loss of

Nationality] under [§] [1481](a)(1)," but could not "approve a [Certificate of Loss of Nationality] for [the plaintiff] based on [§] [1481](a)(1) at th[at] time." AR 48. The letter explained:

> As a threshold matter, the Department cannot approve a [Certificate of Loss of Nationality] based on [§] [1481](a)(1) while the [United States] national is residing in the United States. . . . There is no question that a [United States] citizen who seeks a [Certificate of Loss of Nationality] based on [§] [1481](a)(1) remains so until the Department's approval of the [Certificate of Loss of Nationality], which, by statute, constitutes the final administrative determination of loss. Loss is not automatic upon the commission of the potentially expatriating act.

AR 48–49. The letter further explained that the plaintiff

> did not comply with the applicable procedures to obtain a [Certificate of Loss of Nationality] . . . on the basis of [ ] [§] [1481](a)(1) while abroad prior to his incarceration, including [his] signature on the required Department . . . forms before a consular officer, and [he] cannot do so now while he is within the United States.

AR 49. Finally, defendant Ferber informed the plaintiff's prior-counsel that "[n]othing in [her] letter preclude[d] [the plaintiff] from properly submitting an application for a [Certificate of Loss of Nationality] on the basis of [ ] [§] [1481](a)(1) at some point in the future, once he is outside of the United States." AR 50.

By letter dated December 1, 2016, the plaintiff's prior-counsel responded to defendant Ferber's letter. See AR 51. The plaintiff's counsel raised a number of legal arguments seeking to refute defendant Ferber's "contention that [the Department] cannot issue a [Certificate of Loss of Nationality to the plaintiff] while he is on [United States] soil," reiterating the position "that [the plaintiff] has already lawfully expatriated under [ ] [§] [1481](a)(1) . . . [and] is presently solely a Swiss citizen . . . deportable [ ] under . . . the INA." AR 52; see AR 53–61.

By letter dated February 8, 2017, defendant Ferber again responded to the plaintiff's prior-counsel, informing him that the Department had "reviewed [the plaintiff's] additional arguments," and that "the Department maintain[ed] that [it could] not approve a [Certificate of

Loss of Nationality] for [the plaintiff] under [§] [1481](a)(1) . . . at th[at] time." AR 72.

Specifically, defendant Ferber

> reiterate[d] that [the plaintiff's] request for a [Certificate of Loss of Nationality] on the basis of [§] [1481](a)(1) is unavailing[] because [the plaintiff] is within the United States and, thus, ineligible to expatriate under that section. In accordance with [the] INA . . . , the Department can only issue a [Certificate of Loss of Nationality] on the basis of an application properly completed abroad, in accordance with procedures set forth at 7 FAM [§] 1200 . . . . The process for obtaining a [Certificate of Loss of Nationality] on the basis of [ ] [§] [1481](a)(1) includes the individual signing [Form] DS-4079 before a consular officer at post abroad, and completing an interview with a consular officer to determine whether the expatriating act was performed voluntarily and with the intent to relinquish [United States] citizenship.

AR 72. The letter further explained that "[n]one of the cases on which [the plaintiff's prior-counsel] rel[ied] would permit the Department's issuance of a [Certificate of Loss of Nationality] on the basis of [ ] [§] [1481](a)(1) to a [United States] citizen requesting a [Certificate of Loss of Nationality] from within the United States." AR 72. Finally, the letter "reiterate[d that] th[e] decision d[id] not preclude [the plaintiff] from properly submitting an application for a [Certificate of Loss of Nationality] on the basis of [ ] [§] [1481](a)(1) once he is outside of the United States," and added that, "[s]hould [the plaintiff] do so, the Department would evaluate the substantive aspects of his application at that time." AR 72.

On March 15, 2017, the plaintiff filed this suit, see Complaint at 1,[5] and shortly thereafter, the plaintiff filed his motion for summary judgment, see Pl.'s Mot. at 1. On July 26, 2017, the defendants filed a motion to dismiss the plaintiff's case, see Defs.' Mot. to Dismiss at 1, which the Court denied on April 16, 2010, see Order at 1 (Apr. 16, 2018), ECF No. 26. The

---

[5] Despite having been represented by counsel in his communications with the defendants, the plaintiff has represented that he is now proceeding pro se in this case. See Plaintiff's Notice to the Court and Parties of Pro Se Appearance ("Pl.'s Notice") ¶ 2.

defendants then filed their cross-motion for summary judgment, see Defs.' Cross-Mot. at 1, and the parties' cross-motions for summary judgment are the subject of this Memorandum Opinion.

## II.    STANDARD OF REVIEW

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In the APA context, summary judgment is the mechanism for deciding whether as a matter of law an agency action is supported by the administrative record and is otherwise consistent with the APA standard of review. See, e.g., Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415–16 (1971). But, due to the limited role a district court plays in reviewing the administrative record, the typical summary judgment standards set forth in Federal Rule of Civil Procedure 56 are not applicable. Stuttering Found. of Am. v. Springer, 498 F. Supp. 2d 203, 207 (D.D.C. 2007). Rather, "[u]nder the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas 'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" Id. (quoting Occidental Eng'g Co. v. Immigration & Naturalization Serv., 753 F.2d 766, 769–70 (9th Cir. 1985)). In other words, "when a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal," and "[t]he 'entire case' on review is a question of law." Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (footnote omitted) (citations omitted).

The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." Fed. Commc'ns Comm'n v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009). It requires courts to "hold unlawful and set aside agency action,

findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); "contrary to constitutional right, power, privilege, or immunity," id. § 706(2)(B); or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," id. § 706(2)(C). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). Nonetheless, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Id. (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)). However, "courts 'will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" Pub. Citizen, Inc. v. Fed. Aviation Admin., 988 F.2d 186, 197 (D.C. Cir. 1993) (quoting Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc., 419 U.S. 281, 286 (1974)).

### III. ANALYSIS

The plaintiff challenges the defendants' rejection of his application for a Certificate of Loss of Nationality on numerous grounds. Construing the plaintiff's filings liberally, as the Court must, see Erickson v. Pardus, 551 U.S. 89, 94 (2007) ("A document filed pro se is to be liberally construed[.]" (internal quotation marks omitted)), the plaintiff brings claims pursuant to the APA, the federal mandamus statute, 28 U.S.C. § 1361 (2012), and the Declaratory Judgment Act, 28 U.S.C. § 2201(a) (2012). The Court will address each type of claim in turn.

### A. The Plaintiff's APA Claims

Pursuant to the APA, the plaintiff asks the Court to set aside the defendants' actions as (1) "arbitrary, capricious, an abuse of discretion, . . . [and] not in accordance with law," 5 U.S.C. § 706(2)(A), see, e.g., Am. Compl. ¶ 28 ("[The] defendant[s are] essentially writing [§]

[1481(a)](1) out of the statute, which is . . . not in accordance with law."); (2) "contrary to [a] constitutional right," 5 U.S.C. § 706(2)(B), see, e.g., Pl.'s Reply at 23 (asserting that the defendants have "denied [him] . . . his Constitutional [r]ight to voluntary expatriation"); and (3) "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C); see, e.g., Pl.'s Reply at 10 (asserting that the defendants' refusal to issue him a Certificate of Loss of Nationality is "unlawful[] . . . and short of statutory rights"). Additionally, the plaintiff asserts that the defendants have "unlawfully withheld" a Certificate of Loss of Nationality from him and requests that the Court to compel the defendants to issue it to him. 5 U.S.C. § 706(1); see, e.g., Pl.'s Opp'n to Mot. to Dismiss at 3 ("The defendants[,] in failing to adjudicate the plaintiff's claim for a [Certificate of Loss of Nationality] . . . [,] have unlawfully withheld the [Certificate of Loss of Nationality], . . . abused their discretion[,] and not acted in accordance with law[.]"). The Court considers each alleged violation of the APA in turn.

1.     **Have the Defendants Acted In Excess of Statutory Jurisdiction, Authority, or Limitations, or Short of Statutory Right Under § 706(2)(C) of the APA?**

The defendants denied the plaintiff's request for a Certificate of Loss of Nationality because (1) the Secretary cannot consider or approve a Certificate of Loss of Nationality unless the applicant is located outside of the United States (the "location requirement") and (2) the plaintiff did not satisfy the in-person appearance requirement. The plaintiff asserts that both requirements violate the INA.

Before separately addressing each requirement, the Court must first address the defendants' argument that "[t]he INA unequivocally reflects that loss of nationality is official only upon the Secretary's official final determination to approve it through a [Certificate of Loss of Nationality]" because § 1501 provides that "the Secretary's approval of a [Certificate of Loss of Nationality] is the 'final administrative determination of loss of United States nationality.'"

Defs.' Mem. at 26 (quoting 8 U.S.C. § 1501).  The plaintiff responds, arguing that the INA

mandates that the "loss of [United States] nationality is . . . []automatic[] . . . [upon] the

voluntary performance of one of the seven expatriating acts[] with the intent to relinquish . . .

nationality," Pl.'s Reply at 9; see id. at 7 (asserting that "loss of nationality . . . shall result solely

from the performance of [a] national of the acts or fulfillment of the conditions specified in . . . §

1481" (quoting 8 U.S.C. § 1488)).  The Court agrees with the plaintiff's argument that the

Secretary's interpretation of the statute, which conditions loss of nationality upon the Secretary's

approval, is incorrect.  As this Circuit has explained, albeit in dicta, "[t]here are no exceptions

listed in § 1481 or § 1488 requiring administrative or judicial determinations before citizenship is

lost."  United States v. Yakou, 428 F.3d 241, 249 (D.C. Cir. 2005); see 8 U.S.C. § 1481(a)

("A . . . national of the United States . . . shall lose his nationality by voluntarily performing any

of the [specified] acts with the intention of relinquishing United States nationality[.]"); id. § 1488

("The loss of nationality . . . shall result solely from the performance by a national of the acts or

fulfillment of the conditions specified in this part.").  Thus, "Congress[] [has] determin[ed] that

United States citizenship may be lost automatically, without any administrative or judicial

determination, when a person has voluntarily engaged in certain conduct with the requisite

intent."  Yakou, 428 F.3d at 249; see Weber, 885 F. Supp. 2d at 51 n.5 ("A [Certificate of Loss

of Nationality] does not effect loss of nationality.  Rather, '[i]t is merely an administrative

method for the Government to keep track, for informational purposes, of those persons it

considers to have voluntarily relinquished citizenship.'" (citation omitted)).

Moreover, as the plaintiff correctly notes, see Pl.'s Reply at 2–3, § 1501 makes clear that

loss of nationality is an event that occurs independently of the Secretary's administrative

determination of loss of nationality pursuant to the Certificate of Loss of Nationality process (the

"certification process"), see 8 U.S.C. § 1501 (stating that "a diplomatic or consular officer of the United States" shall prepare a Certificate of Loss of Nationality "[w]henever . . . [he] has reason to believe that a person while in a foreign state has lost his United States nationality" (emphasis added)). Congress's use of the present perfect tense "has lost" demonstrates its intent that loss of nationality occurs prior to the Secretary's administrative determination of loss of nationality. See Barrett v. United States, 423 U.S. 212, 216 (1976) (observing that a statutory "reference [ ] in the present perfect tense[] denot[es] an act that has been completed"); see also United States v. Wilson, 503 U.S. 329, 333 (1992) ("Congress' use of a verb tense is significant in construing statutes.").[6] In addition, § 1501's reference to "a final administrative determination of loss of United States nationality" specifically relates to the certification process, see 8 U.S.C. § 1501 (the provision is entitled "Certificate of diplomatic or consular officer of United States as to loss of American nationality"), which is separate from and occurs after loss of nationality, see id. (describing the certification process as occurring once "a person . . . has lost his United States nationality" (emphasis added)).[7] Thus, the Court concludes that loss of nationality occurs automatically upon the commission of an expatriating act voluntarily and with the intent to relinquish nationality.

---

[6] The defendants unintelligently argue that "given the voluntariness and intent requirements, 'has lost,' in describing [a] consular officer's duties in § 1501, relates to the consular officer's determination of loss following his or her finding of the commission of a potentially expatriating act, voluntariness and intent." Defs.' Reply at 5. Seemingly, the defendants are essentially arguing that Congress used the present perfect tense, which refers to an event that occurred in the past, to refer to an event that would occur in the future, i.e., the consular officer's determination of loss of nationality pursuant to § 1501. This argument is nonsensical and must be rejected.

[7] Moreover, in §§ 1501 and 1503, Congress described the Secretary's approval of a Certificate of Loss of Nationality as "a final administrative determination of loss of United States nationality," 8 U.S.C. § 1501, which makes clear that such a determination is subject to administrative and judicial appeal, see id. (providing that the Secretary's determination is "subject to such procedures for administrative appeal as the Secretary may prescribe by regulation, and also shall constitute a denial of a right or privilege of United States nationality for purposes of section 1503 of this title"); id. § 1503 (permitting persons denied a right or privilege of United States nationality "[to] institute an action . . . for a judgment declaring him to be a national of the United States . . . within five years after the final administrative denial of such right or privilege").

### i.     The Location Requirement

As already explained, the defendants denied the plaintiff's request for a Certificate of Loss of Nationality in part based on their position that "the Department cannot approve a [Certificate of Loss of Nationality] based on [ ] [§] [1481](a)(1) while [a] [United States] national is residing in the United States." AR 48. The defendants argue that, "[b]y stating plainly [in § 1483] that 'no national [of the United States] can lose United States nationality under this chapter while within the United States,' Congress made clear that [the p]laintiff cannot lose his United States nationality while within the United States, regardless of acts he might have performed while outside of the United States." Defs.' Mem. at 27 (quoting 8 U.S.C. § 1483). The plaintiff responds that § 1483(a) does not prohibit the Secretary from considering and approving a Certificate of Loss of Nationality while the applicant is located in the United States. The plaintiff further argues that "Congress did not set any geographic limitation on the duty of a consular officer to adjudicate nationality." Pl.'s Reply at 1.

Because the plaintiff argues that the location requirement violates the INA, "a statute the [Secretary] is charged with enforcing, [the Court must] proceed in accordance with Chevron's familiar two-part test." Am. Bankers Ass'n v. Nat'l Credit Union Admin., 271 F.3d 262, 267 (D.C. Cir. 2001) (citing Chevron, USA, Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984)). "Pursuant to Chevron [s]tep [o]ne, if the intent of Congress is clear, the reviewing court must give effect to that unambiguously expressed intent." Id. (citation and internal quotation marks omitted). In determining whether "Congress has directly spoken to the precise question at issue," Nat'l Treasury Emps. Union v. Fed. Labor Relations Auth., 414 F.3d 50, 57 (D.C. Cir. 2005), courts "us[e] the traditional tools of statutory construction," Cal. Indep. Sys. Operator Corp. v. Fed. Energy Reg. Comm'n, 372 F.3d 395, 400 (D.C. Cir. 2004), including "evaluation of the plain statutory text at issue, the purpose and structure of the statute as a whole,

while giving effect, if possible, to every clause and word of a statute, and—where appropriate—the drafting history," Pharm. Research & Mfrs. of Am. v. Fed. Trade Comm'n, 44 F. Supp. 3d 95, 112 (D.D.C. 2014), aff'd 790 F.3d 198 (D.C. Cir. 2015). However, "[i]f Congress has not directly addressed the precise question at issue, the reviewing court proceeds to Chevron Step Two." Ass'n of Private Sector Colls. & Univs. v. Duncan, 681 F.3d 427, 441 (D.C. Cir. 2012) (citation and internal quotation marks omitted). At step two, "the court defers to the [agency]'s interpretation so long as it is 'based on a permissible construction of the statute.'" Nat'l Treasury Emps. Union, 414 F.3d at 57 (quoting Chevron, 467 U.S. at 842–43).

Here, the Court cannot agree with the defendants that § 1483 unambiguously compels the conclusion that the Secretary may only consider Certificate of Loss of Nationality applications submitted by applicants who are abroad. See Defs.' Mem. at 27. Although § 1483 states that "no national can lose United States nationality under [§ 1481(a)(1)–(5)] while within the United States," 8 U.S.C. § 1483, for the reasons already explained, loss of nationality and approval of a Certificate of Loss of Nationality are separate events, and § 1483 does not address Certificates of Loss of Nationality, let alone state that any part of the certification process must occur while a national is abroad. Moreover, § 1501, which specifically addresses the certification process, does not place any restrictions on a Certificate of Loss of Nationality applicant's geographic location. See 8 U.S.C. § 1501. Thus, the Court cannot agree with the defendants that § 1483 compels the Secretary to reject a Certificate of Loss of Nationality application submitted by a person who is located within the United States.

The Court must also reject the defendants' argument that § 1104(a)(3) unambiguously compels them to reject applications submitted by persons located within the United States. See

Defs.' Resp. at 2.  Section 1104, which addresses the "Powers and duties of [the] Secretary of State" with respect to immigration and nationality laws, provides:

> The Secretary of State shall be charged with the administration and the enforcement of the provisions of this chapter and all other immigration and nationality laws relating to (1) the powers, duties, and functions of diplomatic and consular officers of the United States, except those powers, duties, and functions conferred upon the consular officers relating to the granting or refusal of visas; (2) the powers, duties, and functions of the Administrator; and (3) the determination of nationality of a person not in the United States.

8 U.S.C. § 1104(a).  Applying "the statutory construction principle, expressio unius est exclusion alterius, that is, the 'mention of one thing implies the exclusion of another thing,'" Halverson v. Slater, 129 F.3d 180, 185 (D.C. Cir. 1997), Congress's grant of power to the Secretary regarding "the determination of nationality of a person not in the United States," 8 U.S.C. § 1104(a)(3) (emphasis added), might suggest that Congress intended to deny the Secretary authority over nationality determinations of persons in the United States.  However, as this Circuit has instructed,

> [t]he expressio unius canon is a "feeble helper in an administrative setting, where Congress is presumed to have left to reasonable agency discretion questions that it has not directly resolved."  It offers "too thin a reed to support the conclusion that Congress has clearly resolved an issue."  And when countervailed by a broad grant of authority contained within the same statutory scheme, the canon is a poor indicator of Congress' intent.

Adirondack Med. Ctr. v. Sebelius, 740 F.3d 692, 697 (D.C. Cir. 2014) (citations omitted).

Reading § 1104(a)(3) to deny the Secretary authority over issuing Certificates of Loss of Nationality to persons located within the United States may be reasonable, and finds some support in the statutory structure, which charges the Attorney General with duties related to persons seeking to expatriate while in the United States under (a)(6).  See 8 U.S.C. § 1481(a)(6) (permitting individuals to expatriate by "making in the United States a formal written renunciation of nationality in such form as may be prescribed by, and before such officer as may

be designated by, the Attorney General").  However, "the inquiry at <u>Chevron</u> step one is not satisfied by reasonableness alone," and "nothing [in the statute] <u>unambiguously</u> suggests Congress intended to strip the Secretary of . . . authority" to issue a Certificate of Loss of Nationality to a person located within the United States.  <u>Adirondack Med. Ctr.</u>, 740 F.3d at 697 (emphasis added).  As already referenced, § 1501, the provision specifically addressing Certificates of Loss of Nationality, does not place any geographic limitations on persons eligible for a Certificate of Loss of Nationality and grants the Secretary broad authority to issue regulations governing the certification process and to approve Certificates of Loss of Nationality. <u>See</u> 8 U.S.C. § 1501.  Moreover, § 1104(a)(1) gives the Secretary broad authority to issue "regulations; prescribe [ ] forms of reports, entries, and other papers; issue [ ] instructions; and perform [ ] other acts as he deems necessary for carrying out" § 1501, which relates to "the powers, duties, and functions of diplomatic and consular officers."  <u>Id.</u> § 1104(a)(1).  These broad grants of authority undermine the force of the expressio unius canon with respect to § 1104(a)(3).  <u>See</u> <u>Adirondack Med. Ctr.</u>, 740 F.3d at 698 ("[W]hen countervailed by a broad grant of authority contained within the same statutory scheme, the canon is a poor indicator of Congress's intent.").

Additionally, as the plaintiff correctly notes, <u>see</u> Pl.'s Resp. at 3, reading § 1104(a), which addresses the Secretary's authority with respect to the INA, as well as "all other immigration and nationality laws," 8 U.S.C. § 1104(a), to divest the Secretary of authority to make nationality determinations regarding persons located within the United States would conflict with another INA provision that expressly grants the Secretary such authority, <u>see, e.g.</u>, 8 U.S.C. § 1452(b) (providing that an individual "who claims to be a national, but not a citizen, of the United States may apply to the Secretary . . . for a certificate of non-citizen national

status" and, upon satisfying certain requirements, "shall be furnished . . . with a certificate of non-citizen national status, but only if the individual is at the time <u>within the United States</u> or its outlying possessions" (emphasis added)).  The Court must avoid interpreting § 1104(a)(3) to conflict with such provisions.  See <u>Adirondack Med. Ctr.</u>, 740 F.3d at 697 ("[W]hen one possible interpretation of a statutory provision has the potential to render another provision inert, we cannot simply say[] . . . that we are reviewing the former in isolation.  Rather, the canon's relevance and applicability must be assessed within the context of the entire statutory framework."); <u>see also</u> <u>Digital Equip. Corp. v. Desktop Direct, Inc.</u>, 511 U.S. 863, 879 (1994) ("[W]hen possible, courts should construe statutes . . . to foster harmony with other statutory and constitutional law.").  Indeed, the Secretary acknowledges that, another provision of the INA, § 1185, requires him to exercise such authority in certain circumstances.  <u>See</u> Defs.' Resp. at 2 n.2 (conceding that "[t]he . . . Manual . . . permits an individual located abroad with a pending [Certificate of Loss of Nationality] application to travel to the United States on a [United States] passport if there are immediate travel needs[,] . . . [which] could result in the approval of a [Certificate of Loss of Nationality] while the individual is physically present in the [United States]," in order to "accommodate[] the requirement at . . . § 1185 that [United States] citizens use their [United States] passports to enter and depart the United States").[8]  Thus, the Court must

---

[8] The defendants also argue that allowing expatriation to occur without the Secretary's approval would "make meaningless the Supreme Court's rulings, and the plain language of § 1481(a), regarding the crucial requirements of voluntariness and intent for expatriation."  Defs.' Reply at 4.  However, the voluntariness and intent requirements for expatriation are not meaningless without the Secretary's approval.  Again, § 1481(a), which sets forth those requirements, does not require any administrative or judicial determination.  <u>See</u> <u>Yakou</u>, 428 F.3d at 249.  And, the Supreme Court rulings cited by the defendants provide only that the Secretary cannot deem a citizen expatriated without "proving . . . [the citizen's] intent to relinquish citizenship," <u>Vance v. Terrazas</u>, 444 U.S. 252, 270 (1980); <u>see</u> <u>Afroyim v. Rusk</u>, 387 U.S. 253, 268 (1967) (recognizing "a constitutional right to remain a [United States] citizen . . . unless [an individual] voluntarily relinquishes that citizenship"), which is consistent with the Court's conclusion that Congress intended loss of nationality to be automatic upon an individual's performance of an expatriating act voluntarily and with the intent to relinquish his citizenship.  The defendants urge the Court to adopt the reasoning of a recent Southern District of New York decision, <u>see</u> Defs.' Not. at 1, which concluded that "[e]ven after an individual performs [an] expatriate[ng] act under [§ 1481(a)(1)], that person's loss of [United States]

(continued . . . )

conclude that § 1104(a)(3) does not unambiguously compel the location requirement asserted by the defendants.

For the foregoing reasons, the defendants' counterarguments do not persuade the Court that the INA unambiguously prohibits the Secretary from approving a Certificate of Loss of Nationality for an applicant who is located in the United States. However, the Court also cannot agree with the plaintiff that the statute unambiguously forecloses a location requirement for the issuance of a Certificate of Loss of Nationality. The plaintiff argues that Congress's failure to include a geographic location requirement in § 1501 resolves the question. See Pl.'s Reply at 1. But, as already explained, "[t]he expressio unius canon is a 'feeble helper in an administrative setting,'" especially "when countervailed by a broad grant of authority contained within the same statutory scheme," Adirondack Med. Ctr., 740 F.3d at 697 (citation omitted), such as the Secretary's broad authority to prescribe regulations regarding the certification process, see 8 U.S.C. § 1501, and broad general authority to issue rules and regulations and take other actions to oversee the duties of diplomatic and consular officers, see id. § 1104(a)(1). Therefore, the Court finds at Chevron step one that the text of the statute is ambiguous on the issue of whether Congress intended for a location requirement to apply to the certification process.

Nevertheless, the Court need not move to Chevron step two and decide whether the defendants' location requirement is entitled to any deference. As this Circuit has instructed, "deference to an agency's interpretation of a statute is not appropriate when the agency wrongly believes that interpretation is compelled by Congress." PDK Labs., Inc. v. Drug Enf't Admin.,

---

( . . . continued)
citizenship does not become final until the Secretary . . . approves a [Certificate of Loss of Nationality] on the basis of a report filed by a [United States] diplomatic or consular officer," id. at 2 (first alteration in original) (quoting Belegrinos v. United States, Civ. Action No. 18-1934, 2019 WL 1988489, at *3 (S.D.N.Y. May 6, 2019)). However, for the reasons already explained, this Court respectfully disagrees with the Southern District of New York's reasoning, which does not address this Circuit's dicta in Yakou or § 1501's use of the past tense "has lost." See Belegrinos, 2019 WL 1988489 at *5–7.

362 F.3d 786, 798 (D.C. Cir. 2004) (emphasis added); see also Peter Pan Bus Lines, Inc. v. Fed. Motor Carrier Safety Admin., 471 F.3d 1350, 1354 (D.C. Cir. 2006) ("Chevron step 2 deference is reserved for those instances when an agency recognizes that [ ] Congress's intent is not plain from the statute's face.").  The Court therefore cannot uphold the defendants' denial of the plaintiff's request for a Certificate of Loss of Nationality due to the plaintiff's failure to satisfy the location requirement.  Cf. Arizona v. Thompson, 281 F.3d 248, 259 (D.C. Cir. 2002) ("'[A]n agency regulation must be declared invalid, even though the agency might be able to adopt the regulation in the exercise of its discretion, if it was not based on the [agency's] own judgment but rather on the unjustified assumption that it was Congress' judgment that such [a regulation is] desirable' or required.").

### ii.       The In-Person Appearance Requirement

The plaintiff argues that the in-person appearance requirement is invalid because "Congress has directly spoken to the issue of whether the Secretary may impose additional requirements other than those already specified by Congress in chapter 3 [of the INA] . . . , [and] th[e] answer is they may not."  Pl.'s Reply at 8.  Specifically, the plaintiff argues that at least three provisions of the INA demonstrate that "the Secretary may [not] impose additional requirements other than those already specified by Congress in chapter 3 [of the INA]."  Pl.'s Reply at 8.  First, he argues that § 1488's instruction that "[t]he loss of nationality . . . shall result solely from the performance of [a] national of the acts or fulfillment of the conditions specified in this chapter," 8 U.S.C. § 1488, "unambiguously expresses Congress's intent that the relevant factors for loss of nationality . . . are [confined to] . . . the acts . . . [and] conditions specified in chapter 3."  Pls.' Reply at 7; see Pl.'s Mot. ¶ 37 (Section "1488 unambiguously forecloses [imposing] additional requirements before loss of nationality is effective.").  Second, he argues that "[i]n . . . [§] 1501, Congress unambiguously and expressly gave the command 'shall' to [a]

diplomatic or consular officer to 'certify the facts' if he believes a citizen 'has lost' . . . his United States nationality," and "[w]here Congress expressly gives consular officers a mandate, the Secretary is not authorized to overturn their good judgment."  Pl.'s Reply at 8–9.  Third, he argues that "[§] 1481(a)(1) [ ] unequivocally does not mention a personal appearance as a requirement," and, if Congress had intended to impose such a requirement for § 1481(a)(1), it would have done so, given that it "expressly authorized [that requirement] in [§] 1481[(a)](5)." Id. at 11; see id. at 6 ("The Secretary's current litigating position nullifies [§] 1481(a)(1–3) and [22] C.F.R. [§] 50.40.").

None of the plaintiff's arguments are compelling.  Even if the Secretary may not require an in-person appearance as a condition for loss of nationality under § 1481(a)(1), that proposition does not compel the conclusion that the Secretary may not impose such a requirement for a Certificate of Loss of Nationality, which, as already explained, constitutes only an administrative acknowledgement of loss of nationality.  See Weber, 885 F. Supp. 2d at 51.  As discussed earlier, the Secretary possesses broad authority to prescribe regulations regarding the certification process and ultimately decides whether to approve a Certificate of Loss of Nationality, see 8 U.S.C. § 1501, as well as broad general authority to issue rules and regulations and take other actions to oversee the duties of diplomatic and consular officers, see id. § 1104(a)(1).  Moreover, § 1481(a)(5), which specifically authorizes the Secretary to "prescribe[]" the "form" of formal renunciation does not demonstrate Congress's intent to prohibit the Secretary from requiring a personal appearance for a Certificate of Loss of Nationality.  See, e.g., Pl.'s Reply at 4 (arguing that the defendants "have failed to show that the INA directly speaks to whether a citizen must appear before a diplomatic or consular officer in a manner prescribed by him when an individual seeks a [Certificate of Loss of Nationality] under [§] 1481(a)(1)").  Rather, § 1481(a)(5) relates

only to prescribing the form of an expatriating act itself, not prescribing the requirements for obtaining a Certificate of Loss of Nationality. Thus, the Court cannot conclude that the Secretary exceeded his statutory authority by requiring an in-person appearance for a Certificate of Loss of Nationality.

Concluding that the INA expressly grants the Secretary authority to prescribe rules governing the certification process, the Court need not analyze the in-person requirement pursuant to the Chevron framework; rather, it need only apply "traditional arbitrary and capricious review." Oconus Dod Emp. Rotation Action Grp. v. Cohen, 140 F. Supp. 2d 37, 45 n.7 (D.D.C. 2001), aff'd sub nom. Oconus Dod Emp. Rotation Action Grp. v. Rumsfeld, 38 F. App'x 2 (D.C. Cir. 2002) (concluding that "Chevron[] [ ] [wa]s inapplicable . . . , as [it] is principally concerned with whether an agency has authority to act under a statute, . . . [and] the authorizing statute [at issue] g[a]ve [the agency] express authority to exercise its discretion to establish a [particular] policy"); see OSG Bulk Ships, Inc. v. United States, 132 F.3d 808, 812 n.7 (D.C. Cir. 1998) ("[W]hen Congress has 'explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation' and ensuing regulations are reviewed pursuant to the arbitrary-or-capricious standard." (quoting Chevron, 467 U.S. at 843–44)); cf. Judulang v. Holder, 565 U.S. 42, 52 n.7 (2011) (declining to analyze an agency policy that was "not an interpretation of any statutory language" under Chevron step two because "the more apt analytic framework . . . is standard 'arbitrary [or] capricious' review under the APA").

Agency action is "arbitrary and capricious" if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the

agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43. "The requirement that agency action not be arbitrary and capricious [also] includes a requirement that the agency adequately explain its result." Dickson v. Secretary of Def., 68 F.3d 1396, 1404 (D.C. Cir. 1995). To that end, "[t]he arbitrary and capricious standard of the APA 'mandat[es] that an agency take whatever steps it needs to provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision.'" Appleby v. Harvey, 517 F. Supp. 2d 253, 260 (D.D.C. 2007) (Walton, J.) (quoting Dickson, 68 F.3d at 1404), aff'd sub nom. Appleby v. Geren, 330 F. App'x 196 (D.C. Cir. 2009) (alteration in original). "This does not mean that an agency's decision must be a model of analytic precision to survive a challenge. A reviewing court will 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" Dickson, 68 F.3d at 1404. "However, the explanation provided by the agency must, at a minimum, contain 'a rational connection between the facts found and the choice made.'" Appleby, 517 F. Supp. 2d at 260–61 (quoting Dickson, 68 F.3d at 1404).

Here, evidence of the Department's rationale at the time it adopted the in-person appearance requirement is scant. Indeed, the origin of the requirement, which does not explicitly appear in the Manual but only on Forms DS-4079 and DS-4081, is unclear.[9] However, the Court

---

[9] Although the defendants suggest that the in-person appearance requirement appears in the Manual, see Defs.' Mem. at 29, the provisions of the Manual cited by the defendants do not contain any such requirement. Rather, the cited provisions require only that consular officers "arrange to interview [a] citizen," without specifying whether the interview need be in person. 7 FAM Exhibit 1221 (instructing consular officers to "arrange to interview [a] citizen" when they "become aware a citizen acquired foreign nationality [a]nd[] the citizen asserts or advises [the officer] in response to [the officer's question that the intent was to relinquish U.S. citizenship"). And indeed, it states that an in-person appearance requirement is not necessary in every circumstance. See 7 FAM § 1224.5 (instructing that "[a]fter [a consular officer] receive[s] the [DS-4079] questionnaire and any additional documents, it may be necessary to contact the [applicant] to discuss next steps and clarify any issues that arise in reviewing the responses to . . . [the] [q]uestionnaire[] . . . , such as contradictory statements. Consular officers can be flexible in determining whether this should include an in person, telephone[,] or e-mail contact, or to request additional documentation." (emphasis added)). Thus, the only documents in the record that explicitly refer to the in-person appearance requirement are Forms DS-4079 and DS-4081. See AR 107 (Form DS-4079 instructing applicants that they "may

(continued . . . )

cannot conclude that the requirement lacks any contemporaneous explanation.  Form DS-4081

itself provides useful context.  Specifically, Form DS-4081 requires a consular officer to attest

that an applicant

> appeared personally and[] read [or] had read to him/her th[e] [Statement of
> Understanding Concerning the Consequences and Ramifications of Renunciation
> or Relinquishment of United States Nationality] after [the consular officer's]
> explanation of [the statement's] meaning and the consequences of
> renunciation/relinquishment of United States nationality and signed th[e]
> statement[] under oath [or] by affirmation before [the consular officer.]

AR 109.  This language suggests that Form DS-4081's in-person appearance requirement seeks

to ensure that an applicant understands the consequences of loss of nationality, which is an

inquiry rationally related to a consular officer's determination of whether an individual

performed an expatriating act with the requisite intent.  See 7 FAM § 1227(a) ("Form DS-4081 .

. . is highly pertinent to knowing intent to relinquish [United States] citizenship."); see also 7

FAM § 1226(c) ("The intention to relinquish [United States] nationality . . . does not exist in

cases where a renunciant plans or claims a right to continue to reside in the United States unless

the renunciant demonstrates that residence will be as an alien documented properly under

[United States] law."); Lozada Colon v. U.S. Dep't of State, 2 F. Supp. 2d 43, 45 (D.D.C. 1998)

(affirming the Secretary's determination that a United States national lacked the requisite intent

to expatriate because the national "want[ed] to remain a resident of Puerto Rico").

Moreover, the Manual indicates that Form DS-4079 is also designed to assist consular

officers in "inquir[ing] about . . . [an] individual's intention regarding his . . . [United States]

citizenship in committing [a potentially expatriating] act."  7 FAM § 1224.3(a).  And, given that

---

( . . . continued)

sign . . . before a [c]onsular [o]fficer at a [United States] Embassy or Consulate"); see also AR 109 (Form DS-4081
requiring a "consular officer's attestation" that the citizen "appeared personally . . . and signed th[e] statement . . .
before [the officer]").

the Manual also indicates that observation of an applicant's "demeanor[] . . . and composure" assists consular officers and the Department in assessing an individual's intent, see 7 FAM § 1226(b) (instructing that consular officers "should prepare a thorough, thoughtful opinion that includes all information [the officer] ha[s] about the [applicant's] demeanor, state of mind, and composure, the potentially expatriating act, and the issues of voluntariness and intent"); see also 7 FAM Ex. 1226 (sample consular officer opinion indicating that an applicant "appeared to understand the irrevocable nature of relinquishment of [United States] nationality when he/she performed the act" (emphasis added)), the Court finds that Form DS-4079's in-person appearance requirement is rationally related to a consular officer's determination of an applicant's intent. Thus, based on the context provided in Form DS-4081 itself and the Manual provisions cited by the defendants, the Court can "reasonably [ ] discern[]" the Secretary's purpose for the in-person appearance requirement, Dickson, 68 F.3d at 1404, and concludes that the requirement is rationally related to that purpose, see Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43.[10]

The plaintiff's counterarguments are again unpersuasive. The plaintiff argues that the imposition of an in-person appearance requirement violates § 1501, which "unambiguously directs a diplomatic or consular officer[,] 'if he has a reason to believe that a person while in a [foreign] state has lost his United States nationality . . . [,] [to] []prepare a [Certificate of Loss of Nationality]." Pl.'s Reply at 2; see id. at 8–9 ("Where Congress expressly gives consular officers a mandate, the Secretary is not authorized to overturn their good judgment."); Pl.'s Resp. at 2

---

[10] The defendants assert that they are entitled to Chevron deference under Barnhart v. Walton, 535 U.S. 212 (2002). See Defs.' Mem. at 29. However, because the Court concludes that the Chevron framework is inapplicable, it need not address this argument. In any event, even if the Court were to accord the defendants Chevron deference, the Court's analysis would likely lead to the same result as its arbitrary and capricious analysis above. See Humane Soc'y of U.S. v. Zinke, 865 F.3d 585, 605 (D.C. Cir. 2017) (acknowledging that "analysis of the reasonableness of agency action 'under Chevron Step Two and arbitrary and capricious review is often the same'" (citation omitted)).

("Congress . . . commanded [consular officers] to act 'whenever' [they] had reason to believe a citizen 'has lost' . . . his nationality."). He concludes that the defendants must issue him a Certificate of Loss of Nationality because "he fulfilled all of the required elements of [§§] 1481(a)(1), 1483, 1488, and 1501." Pl.'s Mot. ¶ 49; see id. ¶ 51 (asserting that the "defendants are required as a matter of law to issue to him a [Certificate of Loss of Nationality]"). Although the Court agrees with the plaintiff that loss of nationality under § 1481(a)(1) is automatic upon naturalizing in a foreign country voluntarily and taking up residence in a foreign state, coupled with the intent to expatriate, it cannot agree that the preparation and approval of a Certificate of Loss of Nationality must also be automatic upon loss of nationality. Although § 1501's instruction that a consular officer "shall" prepare a Certificate of Loss of Nationality, 8 U.S.C. § 1501 (emphasis added), and thereby suggesting "a mandatory duty," Kakeh v. United Planning Org., Inc., 655 F. Supp. 2d 107, 123 (D.D.C. 2009) ("[W]hen a statute uses the term 'shall,' it creates a mandatory duty."), as the defendants correctly note, see Defs.' Mem. at 27, § 1501 also provides that a consular officer's duty to prepare a Certificate of Loss of Nationality is subject to "regulations prescribed by the Secretary," 8 U.S.C. § 1501, and that a Certificate of Loss of Nationality is subject to the Secretary's ultimate approval, see id. Moreover, § 1104(a)(1) generally subjects consular officers' duties to rules, regulations, and instructions issued by the Secretary. See id. § 1104(a)(1). Additionally, a consular officer's duty to prepare a Certificate of Loss of Nationality arises only when the officer "has reason to believe that a person . . . has lost his United States nationality," 8 U.S.C. § 1501, which is a discretionary condition that the statute does not define and that "inherently conveys uncertainty." Cf. Nat'l Ass'n of Mfrs. v. Secs. & Exchange Comm'n, 800 F.3d 518, 550 n.6 (D.C. Cir. 2015). And, the Secretary's approval of a Certificate of Loss of Nationality appears wholly discretionary, as § 1501 does not

place any restrictions on the Secretary's approval function.  See 8 U.S.C. § 1501.  Based on this

context, the Court cannot conclude that the INA mandates that consular officers are required to

prepare a Certificate of Loss of Nationality upon the loss of nationality, regardless of any

conditions imposed by the Secretary.  See Cal. Indep. Sys. Operator Corp., 372 F.3d at 400

(requiring courts to "read [statutory terms] in context"); see also Am. Bankers Ass'n, 271 F.3d at

267 ("[W]e must not 'confine [ourselves] to examining a particular statutory provision in

isolation. The meaning[] . . . of certain words or phrases may only become evident when placed

in context.'" (quoting Food & Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S.

120, 132 (2000))); cf. Pennsylvania v. Lynn, 501 F.2d 848, 854 (D.C. Cir. 1974) ("[D]iscerning

Congress's intent to bestow or withhold discretion . . . is not a simple matter of tallying the

'shalls' and 'mays' and finding that the 'mays' have it.").

      Moreover, the Court cannot agree with the plaintiff that "Congress expressly divested

authority from the Secretary and gave it to the diplomatic and consular officers who 'shall certify

the facts.'"  Pl.'s Reply at 8 (quoting 8 U.S.C. § 1501).  As already discussed, § 1501 expressly

subjects the certification process to the Secretary's regulations and ultimate approval.  See 8

U.S.C. § 1501 ("If the report of the diplomatic or consular officer is approved by the Secretary of

State, a copy of the certificate shall be forwarded to the Attorney General[] . . . [and] to the

person to whom it relates." (emphasis added)).[11]

      Thus, the Court concludes that it must uphold the in-person appearance requirement.

Accordingly, the Court cannot conclude that the Secretary's denial of the plaintiff's request for a

---

[11] To the extent that the plaintiff also argues that the Secretary could evaluate his intent by means other than his in-person appearance, such as interviewing him by phone or simply reviewing the evidence in his case, that argument would also fail because an agency is "not required to choose the best solution, only a reasonable one."  Petal Gas Storage, LLC v. Fed. Energy Reg. Comm'n, 496 F.3d 695, 703 (D.C. Cir. 2007).

Certificate of Loss of Nationality based on the plaintiff's failure to satisfy the in-person appearance requirement violates § 706(2)(C) of the APA.

2. **Was the Defendants' Decision-Making Process Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Not in Accordance with Law Under § 706(2)(A) of the APA?**

"[Section] 706(2)(A) actions focus mainly on the decision-making process and rationale behind agency action." Individual Reference Servs. Grp. v. Fed. Trade Comm'n, 145 F. Supp. 2d 6, 25 (D.D.C. 2001), aff'd sub nom., Trans Union LLC v. Fed. Trade Comm'n, 295 F.3d 42 (D.C. Cir. 2002). As already explained, agency action is "arbitrary and capricious" if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43.

The plaintiff raises several arguments for why the defendants' actions violate § 706(2)(A), none of which are availing. He argues that the defendants "have acted arbitrarily and capriciously [and not in accordance with law] by failing to meaningfully engage [with his] arguments . . . concerning the '2013 passport,'" Pl.'s Reply at 3; see Pl.'s Opp'n to Mot. to Dismiss at 20 (arguing that the defendants did "not act[] in accordance with law" because they "refused to adjudicate or administer []his case of loss of nationality as Congress required"), and that the defendants' "rationalizations to deny [his] request . . . run counter to the evidence before the agency, which amply met the preponderance of the evidence" standard for demonstrating his loss of nationality, Pl.'s Reply at 3. However, these arguments assume that the defendants should have reviewed the merits of the plaintiff's request for a Certificate of Loss of Nationality, i.e., determine whether the plaintiff intentionally and voluntarily lost his nationality. That was

not required, and for the reasons already explained in Part III.A.1.ii, <u>supra</u>, the Court must

uphold the defendants' in-person appearance requirement and there is no dispute that the plaintiff

failed to satisfy that requirement.  Therefore, the Court cannot conclude that the defendants'

refusal to consider the merits of the plaintiff's request for a Certificate of Loss of Nationality on

the ground that he failed to satisfy the in-person requirement was arbitrary and capricious.  <u>Cf.</u>

<u>Steenholdt v. Fed. Aviation Admin.</u>, 314 F.3d 633, 639 (D.C. Cir. 2003) ("[F]ederal agencies

[must] follow their own rules, even gratuitous procedural rules that limit otherwise discretionary

actions.").

The plaintiff also argues that the defendants acted arbitrarily and capriciously because

"their actions were not based on agency preceden[t]."  Pl.'s Opp'n to Mot. to Dismiss at 25.

Although this Circuit has held that it "cannot uphold a decision where an agency departs from

established precedent without a reasoned explanation," <u>LePage's 2000, Inc. v. Postal Reg.</u>

<u>Comm'n</u>, 642 F.3d 225, 233 (D.C. Cir. 2011), the plaintiff has not identified any such

established precedent from which the defendants departed.  Rather, the plaintiff cites only

<u>Richards v. Secretary of State</u>, 752 F.2d 1413 (9th Cir. 1985), as an example of a situation in

which "the Secretary both approved and served [an individual] a [Certificate of Loss of

Nationality] while [that individual] was physically present in California."  Pl.'s Opp'n at 10.  As

an initial matter, the plaintiff provides no reason for the Court to conclude that the Secretary's

approach in a single case in 1985 constitutes "established precedent."  <u>LePage's 2000, Inc.</u>, 642

F.3d at 233.  In any event, while the actions taken by the Secretary with regard to the plaintiff in

<u>Richards</u> do appear to be inconsistent with his position in this case that he cannot consider or

approve a Certificate of Loss of Nationality for an individual who is located within the United

States, <u>see Richards</u>, 752 F.2d at 1417 (explaining that "[t]he Department [ ] approved [a]

Certificate of Loss of Nationality [for the plaintiff], which was issued on June 22, 1978, and delivered [the Certificate of Loss of Nationality] to Richards in California, where he had returned in December of 1977"), the Secretary's actions in Richards were not inconsistent with the in-person appearance requirement, see id. (explaining that "Richards visited the [United States] Consulate" in Canada, where he "was asked to complete questionnaires relating to his Canadian citizenship and his intent to relinquish his United States citizenship[]").  Although it is unclear from the Ninth Circuit's decision in that case whether Richards signed any forms in the presence of a consular officer, the plaintiff has not presented, and the record does not reflect, any evidence that Richards did not do so.  Thus, the plaintiff has failed to demonstrate that the Secretary's actions in this case represent a departure from established agency precedent.

The plaintiff also suggests that the defendants' refusal to consider the merits of his request for a Certificate of Loss of Nationality is arbitrary and capricious because the Secretary has "already [ ] 'determined' [the] [p]laintiff's United States [n]ationality," Pl.'s Opp'n to Mot. to Dismiss at 9, presumably referring to the Embassy's correspondence with the plaintiff's prior-counsel sent before the defendants' consideration of his claim, in which the Embassy appeared to reject the plaintiff's request on its merits, see AR 16 (stating that because a "[United States] passport was issued to [the plaintiff] in 2013[, after he] acquired Swiss nationality in 2004, . . . expatriation d[id] not apply in his case").  However, as this Circuit has acknowledged, "inconsistent statements by agencies' regional offices during [the] early stages of review do not render [the agency's] decisionmaking process arbitrary and capricious where proper procedures are followed."  WildEarth Guardians v. Jewell, 738 F.3d 298, 312 (D.C. Cir. 2013) (citing Nat'l Ass'n of Home Builders v. Defs. of Wildlife, 551 U.S. 644, 658–59 (2007)); see WildEarth Guardians v. Nat'l Park Serv., 703 F.3d 1178, 1186–87 (10th Cir. 2013) (concluding that emails

expressing the opinions of low-level agency representatives "will not preclude the agency from reaching a contrary decision, so long as the decision is not arbitrary and capricious and is otherwise supported by the record").  Thus, the defendants' ultimate decision to reject the plaintiff's request for a Certificate of Loss of Nationality based on the plaintiff's failure to satisfy the in-person appearance requirement is not undermined by the Embassy's initial consideration of the merits of the plaintiff's case.

For all of these reasons, the Court concludes that the Secretary's decisionmaking process for denying the plaintiff's request for a Certificate of Loss of Nationality did not violate § 706(2)(A) of the APA.

### 3. Have the Defendants Acted Contrary to Constitutional Right, Power, Privilege, or Immunity Under § 706(2)(B) of the APA?

The plaintiff argues that the defendants, by "den[ying] [him] a [Certificate of Loss of Nationality,] . . . [have denied] his Constitutional [r]ight to voluntary expatriation."  Pl.'s Reply at 23.  Specifically, he argues that because "he 'has lost' his United States nationality[,] . . . [the] [defendants'] [refusal] to recognize this loss with a Certificate of Loss of Nationality[] [ ] defeat[s] Congress's ultimate purpose of the INA [with] respect[] to [l]oss of [n]ationality."  Id. at 28.  The defendants respond that their denial of the plaintiff's application for a Certificate of Loss of Nationality was not contrary to constitutional right, power, privilege, or immunity "because [the] [p]laintiff does not have a constitutional right to expatriate in any way he deems fit, only a constitutional right not to be involuntarily expatriated."  Defs.' Mem. at 44.

Although the Supreme Court has recognized that a citizen has the constitutional right to remain a citizen, see Afroyim v. Rusk, 387 U.S. 253, 268 (1967), "[it] has not recognized that the right to abandon one's citizenship constitutes a constitutional right," Kwok Sze v. Johnson, 172 F. Supp. 3d 112, 121 (D.D.C. 2016) (citation and internal quotation marks omitted), aff'd sub

nom. Kwok Sze v. Kelly, No. 16-5090, 2017 WL 2332592 (D.C. Cir. Feb. 21, 2017), and this Circuit has not yet resolved the issue either, see Schnitzler v. United States, 761 F.3d 33, 40 (D.C. Cir. 2014). However, even assuming the plaintiff has a constitutional right to expatriate, the Court cannot conclude that the defendants have acted contrary to that right. For the reasons already explained in Part III.A.1, supra, the plaintiff's loss of nationality pursuant to § 1481(a)(1) is a process separate from the process of applying for and receiving a Certificate of Loss of Nationality, i.e., applying for an administrative acknowledgement of his loss of nationality. Thus, the defendants' denial of the plaintiff's application for a Certificate of Loss of Nationality is not a denial of his right to expatriate but merely a denial of administrative recognition of any loss of nationality. Accordingly, the Court must reject the plaintiff's claim that the defendants' denial of his application for a Certificate of Loss of Nationality was contrary to his constitutional right to expatriate.

### 4. Was Agency Action Unlawfully Withheld or Unreasonably Delayed Under § 706(1) of the APA?

The plaintiff argues that "[t]he defendants[,] in failing to adjudicate [his] claim for a [Certificate of Loss of Nationality] under [§] 1481(a)(1)[,] have unlawfully with[h]eld the [Certificate of Loss of Nationality]." Pl.'s Reply at 3. However, "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." Norton v. S. Utah Wilderness All., 542 U.S. 55, 64 (2004). And, as a previous member of this Court has recognized, "[t]he approval, or disapproval, of the issuance of certification is committed by statute to the discretion of the Secretary." Lozada Colon, 2 F. Supp. 2d at 45; see Belegrinos v. United States, Civ. Action No. 18- 1934, 2019 WL 1988489, at *4 (S.D.N.Y. May 6, 2019) ("[T]he issuance of a [Certificate of Loss of Nationality] is an act that is within the discretion of the issuing authority." (internal quotation marks omitted)). Thus,

"[b]ecause the INA does not require the [defendants] to issue a [Certificate of Loss of Nationality to the plaintiff], his claim under § 706(1) must be denied." <u>Belegrinos</u>, 2019 WL 1988489, at *5.[12]

In sum, the Court concludes that the plaintiff's APA challenges to the defendants' denial of his request for a Certificate of Loss of Nationality must fail. Accordingly, the Court will deny the plaintiff's motion for summary judgment and grant the defendants' cross-motion for summary judgment as to those claims.

## B.     The Plaintiff's Request for Mandamus Relief

The plaintiff seeks a "[j]udicial order requiring [the d]efendants to issue to [him] a Certificate of Loss of [United States] Nationality," Am. Compl. at 26, which the Court construes as a request for mandamus relief pursuant to 28 U.S.C. § 1361. A plaintiff is entitled to mandamus relief pursuant to § 1361 "only if the defendant owes him a clear, nondiscretionary duty." <u>Heckler v. Ringer</u>, 466 U.S. 602, 616 (1984). However, as already discussed, "[t]he approval, or disapproval, of the issuance of certification is committed by statute to the discretion of the Secretary and thus not subject to this Court's mandamus jurisdiction." <u>Lozada Colon</u>, 2 F. Supp. 2d at 45. Accordingly, the Court must reject the plaintiff's demand for mandamus relief. <u>See</u> <u>id.</u>; <u>see also</u> <u>Belegrinos</u>, 2019 WL 1988489, at *4 ("Because the issuance of a [Certificate of Loss of Nationality] is 'an act that is within the discretion of the issuing authority,' Belegrinos is

---

[12] The plaintiff also argues that "[t]he [ ] holding by the [District of Columbia] Circuit in <u>Kaufman v. Nielsen</u> . . . would seem to shine some positive light on [his] arguments." Sept. 5, 2018 Letter at 2. The Court cannot agree. <u>Kaufman</u> involved a plaintiff's challenge to the United States Citizenship and Immigration Services' denial of his request to renounce his nationality pursuant to § 1481(a)(6) on the ground that that the plaintiff had failed to demonstrate that he possessed the requisite intent to renounce. <u>See</u> 896 F.3d 475, 482 (D.C. Cir. 2018). This Circuit held impermissible the United States Citizenship and Immigration Services' interpretation of § 1481's intent requirement, which required proof of "more than one's subjective desire[] [but] also [ ] having a credible plan for leaving the United States." <u>Id.</u> at 484, 487. This holding has no bearing on the plaintiff's claim in this case, as the defendants did not evaluate the plaintiff's intent or otherwise consider the merits of his claim and, for the reasons explained in Part III.C., <u>infra</u>, the Court does not find it appropriate to consider the merits of the plaintiff's claim either.

not entitled to mandamus relief compelling such an act." (quoting <u>Clinton v. Clinton</u>, Civ. Action No. 10-1009, 2010 WL 4828990, at *2 (D.D.C. Nov. 29, 2010)).

## C.      The Plaintiff's Request for Declaratory Relief

The plaintiff finally "seeks a judicial determination of [his] loss of United States nationality under [the Court's] authority granted in" the Declaratory Judgment Act.  Pl.'s Resp. at 1; <u>see</u> Pl.'s Reply at 5 ("As a matter of law[,] the plaintiff is entitled to . . . a declaration of his loss of United States citizenship[.]").  "The Declaratory Judgment Act . . . 'gives courts discretion to determine whether and when to entertain an action.'"  <u>Slinski v. Bank of Am., N.A.</u>, 981 F. Supp. 2d 19, 38 (D.D.C. 2013) (citation omitted) (quoting <u>Swish Mktg., Inc. v. Fed. Trade Comm'n</u>, 669 F. Supp. 2d 72, 76 (D.D.C. 2009)).  "In deciding whether to exercise its permissive jurisdiction over declaratory actions, a court may consider 'equitable, prudential, and policy arguments.'"  <u>Id.</u> (quoting <u>MedImmune, Inc. v. Genentech, Inc.</u>, 549 U.S. 118, 136 (2007)).  "Although there are no dispositive factors, the [District of Columbia] Circuit has listed several relevant considerations to guide the Court's analysis[.]"  <u>Swish Mktg.</u>, 669 F. Supp. 2d at 76 (internal quotation marks and citation omitted).  These factors include

> whether [a declaratory judgment] would finally settle the controversy between the parties; whether other remedies are available or other proceedings pending; the convenience of the parties; the equity of the conduct of the declaratory judgment plaintiff; prevention of "procedural fencing"; the state of the record; the degree of adverseness between the parties; and the public importance of the question to be decided.

<u>Id.</u> at 76–77 (quoting <u>Hanes Corp. v. Millard</u>, 531 F.2d 585, 591 n. 4 (D.C. Cir. 1976)).

Applying these discretionary factors, the Court does not find that a declaratory judgment that the plaintiff has lost his United States nationality is appropriate.  First, such a judgment "would [not] finally settle the controversy between the parties," <u>id.</u> at 76, which is "[o]ne of the most important considerations that may induce a court to deny declaratory relief," 10B Charles

Alan Wright, et al., Fed. Prac. & Proc. § 2759 (4th ed. 2009). This is because, even if the Court issued such a judgment, the defendants would not necessarily be obligated to issue the plaintiff a Certificate of Loss of Nationality, as the decision to issue a Certificate of Loss of Nationality is committed to the Secretary's discretion under the statute. See Lozada Colon, 2 F. Supp. 2d at 45. For this reason, it is also not clear that the requested declaratory relief would benefit the plaintiff, which also weighs against granting declaratory relief. See Penthouse Int'l, Ltd. v. Meese, 939 F.2d 1011, 1020 (D.C. Cir. 1991) ("Where it is uncertain that declaratory relief will benefit the party alleging injury, the court will normally refrain from exercising its equitable powers."). Additionally, the Court does not find "the state of the record" to be adequate to determine the plaintiff's nationality, Swish Mktg., 669 F. Supp. 2d at 76, given that the defendants have not yet conducted an inquiry into the plaintiff's allegations regarding his loss of nationality or made an initial determination on those allegations. Indeed, this Circuit has suggested that courts are not equipped to determine an individual's nationality in the first instance without the benefit of the Secretary's expertise. Cf. Fox v. Clinton, 684 F.3d 67, 80 (D.C. Cir. 2012) (remanding to the Secretary to reevaluate the plaintiff's nationality and recognizing "that in the field of immigration generally, and expatriation more specifically, there may be sensitive issues lurking that are beyond the ken of the court. The Department, not the court, has the authority, discretion, and presumed expertise to act in the first instance to address matters within its domain of authority under the INA, subject of course to appropriate judicial review."). For all these reasons, the Court declines to exercise its equitable power to issue the declaratory relief requested by the plaintiff.

## IV.    CONCLUSION

For the foregoing reasons, the Court concludes that the defendants' denial of the plaintiff's request for a Certificate of Loss of Nationality does not violate the APA or otherwise result in the violation of the law.  Additionally, the Court concludes that the mandamus and declaratory relief requested by the plaintiff is not warranted.  Accordingly, the Court concludes that it must deny the plaintiff's motion for summary judgment and grant the defendants' cross-motion for summary judgment.[13]

**SO ORDERED** this 27th day of November, 2019.

REGGIE B. WALTON
United States District Judge

---

[13] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.